MANSFIELD PLUMBING
PRODUCTS, LLC,
Plaintiff,

v.

MARINER PARTNERS, INC.,
et al., Defendants.

No. 1:01–CV–2396.

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 22, 2004.

Andrea J. Kochensparger, Perrysville, OH, Joseph T. Ostrowski, R. Patrick

Baughman, Baughman & Associates, Cleveland, OH, for Plaintiff.

John Winship Read, Elia O.Woyt, Lisa B. Forbes, Vorys, Sater, Seymour & Pease, Cleveland, OH, for Defendants.

## MEMORANDUM OF OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WELLS, District Judge.

This case involves a contract dispute between plaintiff Mansfield Plumbing Products LLC ("Mansfield") and defendants Mariner Partners, Inc. and Howard, Merrell & Partners, Inc. (collectively referred to as "HMP"). Specifically, the dispute centers on whether the parties fulfilled the terms of a letter agreement entered into by Mansfield and HMP on 16 May 2000 whereby HMP agreed to handle brand consulting, research, and marketing support for Mansfield. Both sides have filed motions for summary judgment (Docket # 76 and # 81), oppositions to those motions (Docket # 82 and # 84), replies (Docket # 83 and # 85), and plaintiff has filed a sur-reply to defendants' motion (Docket # 86). While plaintiff seeks summary judgment only on defendants' counterclaims,[1] defendants seek summary judgment on plaintiff's claims as well as their own counterclaims. Because of the interrelated nature of the motions and the claims themselves, this Court addresses both simultaneously.

---

1. While only defendant Howard, Merrell & Partners, Inc. filed counterclaims, (Docket # 46) the Court, for the sake of simplicity, refers to them throughout its discussion as "defendants' counterclaims" or "HMP's counterclaims."

For reasons discussed below, summary judgment is granted in plaintiff's favor on defendants' unjust enrichment counterclaim and in defendants' favor on all of plaintiff's claims as well as defendants' counterclaim for breach of contract.

## I. *Factual Background*

In May 2000, plaintiff HMP [2] and defendant Mansfield entered into a Letter of Agreement ("Letter Agreement" or "Agreement") which established an arrangement by which HMP would "handle brand consulting, research, marketing support and related activities" for Mansfield. (Docket # 76, Ex. 1). The Letter Agreement, signed by Michael Sotak, Vice President of Marketing and Sales for Mansfield and by William Merrell, President and CEO of HMP, took effect on 22 May 2000 and continued through 31 March 2001. (Docket # 76, Ex. 1, at ¶ A.1.). It automatically renewed for additional twelve month periods unless terminated "by either party on March 31, 2001, plus four months written notice, or at the end of subsequent 12-month periods plus three-months written notice." (Docket # 76, Ex. 1, at ¶ A.1. and 2.). Upon termination of the agreement, Mansfield was required to pay HMP "the cost of all authorized work-in-process on the date of termination." (Docket # 76, Ex. 1, at ¶ A.2.). According to the Agreement, HMP was to provide four major types of services: 1) Strategic and Marketing Counsel; 2) Advertising and Marketing Support Services; 3) Creative Projects; and 4) Research, Database, and PR projects. (Docket # 76, Ex. 1, at ¶ B).

Compensation for HMP's services under the Agreement varied based upon the type of activity in which it was engaged:

### General Marketing and Strategic Services

Compensation for the activities indicated above will be the greater of (1) the monthly minimum of $15,000 per month, or (2) actual time cost. Time costs will be reconciled quarterly.

Agency shall place all media and retain commissions on all media placed during the term of the agreement.

### Creative Projects

Project costs will be estimated and approved as specified in section C, and shall include third-party costs plus a 15% margin, and direct creative time plus a 20% margin.

### Research, Database, and PR projects

All projects under this section will be based on pre-approved costs negotiated in good faith.

(Docket # 76, Ex. 1, at ¶ C.5., Exhibit A). Section C of the Letter Agreement sets out a more detailed compensation arrangement and billing procedure for creative projects:

1. Written media schedules and media cost estimates, and production cost estimates for creative work, are to be presented for [Mansfield's] approval *prior* to contracting and/or placing creative work in final production.

2. In some cases, [Mansfield] may give verbal approval to proceed prior to written estimate approval, in which

---

2. The Letter Agreement was originally entered into by Howard, Merrell & Partners, Inc., a North Carolina Corporation, ("HMP-NC") and Mansfield Plumbing Products, Inc. On 1 August 2000, HMP-NC sold substantially all of its assets to another corporation, Howard, Merrell & Partners, Inc., a Delaware corporation ("HMP-Del.") HMP-Del. as-

sumed the contractual rights, duties and obligations of HMP-NC, including the contract between HMP-NC and Mansfield. HMP-NC subsequently changed its name to Mariner Partners, Inc. ("Mariner"). In November 2000, Mansfield Plumbing Products, Inc underwent a corporate restructuring and became Mansfield Plumbing Products, LLC.

case a conference report will serve as interim approval.

3. It is understood that specific final costs cannot be estimated for creative projects until a project is completed through copy platform and layout, and [Mansfield] will pay costs to date for any authorized project which is terminated in progress. A conference report and/or approved strategy work plan will serve as authorization to commence work on creative projects.

4. Except as specified in Paragraphs C.2. and C.3., [Mansfield] shall be responsible only for those costs specifically approved or for which such advance approval has been given. [HMP] will make no financial commitments on [Mansfield's] behalf without first having approval, nor will creative work be placed in final production without [Mansfield's] approval as set forth above.

Following the execution of the Letter Agreement, HMP began to provide research, advertising, and marketing services to Mansfield. In conducting work under the Letter Agreement, Sotak acted as the contact person for Mansfield and Jim Cobb was the business group director who, with Don Solomon's assistance, organized and oversaw HMP's work on the Mansfield account. (Dep. of Sotak Vol. II, at 132–33; Dep. of Solomon, at 11; Cobb Decl. at ¶ 1). Mansfield alleges that during the course of the Letter Agreement it paid HMP in excess of $270,000. (Docket # 76, at and # 84, at 6). For its part, HMP alleges that it worked diligently to provide research, advertising and marketing services to Mansfield through July 2001. Plaintiff does not dispute that HMP interviewed members of Mansfield's management team, conducted a brand probe study, conducted secondary research, conducted a positioning and segmentation study, developed and presented a brand development plan, and gave various presentations regarding proposed marketing strategies. (Docket # 84, at 7–8). However, Mansfield contends that HMP's performance was inadequate with respect to various marketing projects and that it failed to obtain prior approval for a number of projects. (Docket # 84, at).

On 29 March 2001, Sotak informed HMP that Mansfield was not going to renew the Letter Agreement in its current form because of, at least in part, Mansfield's financial condition. (Dep. of Sotak, at 184, Ex. 46). On that same day, however, Sotak approved a cost estimate to proceed with the photography shoot and brochure development for the "Water World" brand campaign and with brochure development. (Dep. of Sotak, at 178, Ex. 46). These brochures needed to be ready fairly quickly for an upcoming kitchen and bath show. (Dep. of Sotak, at 181–82, Ex. 46). Because the photography session was needed in order to complete the brochures, the photographers were authorized to begin work immediately. (Dep. of Sotak, at 181–82, Ex. 46). On 2 April 2001, HMP told Sotak that it could not front checks on behalf of Mansfield to pay photographers for Mansfield's brand campaign until Mansfield brought its accounts payable current. (Dep. of Sotak, at 193, Ex. 49). Sotak agreed to check with accounting to see if Mansfield could pay its outstanding balance of $258,232.16. (Dep. of Sotak, at 193–94, Ex. 49). Due to short-term cash flow problems, Mansfield, on 3 April 2001, asked HMP to suspend its work on the Mansfield brand campaign indicating that work would likely resume later in the summer. (Dep. of Sotak, at 194–95, Ex. 50). The photography session was cancelled and HMP ceased its substantive work for Mansfield at that time. (Dep. of Sotak, at 193–94 and 202, Ex. 49,). HMP sent Mansfield invoices for all the work it did.

(Cobb Decl. at ¶ 2, Ex. A). Sotak reviewed each of the open invoices and verified that they should be paid. (Dep. of Sotak, at 202–203).

Subsequently, on 6 September 2001, Mansfield sued HMP in the Ohio Court of Common Pleas for Ashland County. (Docket # 1, Ex. A). After the case was removed to federal court by HMP, Mansfield filed, on 18 September 2002, its second amended complaint seeking a declaratory judgment (count one) and alleging breach of contract and a failure of conditions precedent (count two), breach of the covenant of good faith and fair dealing (count three), unjust enrichment (count four), and an action for an accounting (count five). On 3 October 2002, both defendants filed their answers to Mansfield's second amended complaint, and defendant Howard, Merrell & Partners, Inc filed a counterclaim for breach of contract and unjust enrichment. (Docket # 45 and # 46).

## II. Standard for Summary Judgment

Summary judgment is appropriate if the evidence in the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the nonmoving party has the burden of proof in a case, the moving party can satisfy its initial burden "by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

If the motion is properly made and supported as provided in Rule 56(c), the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. It is not enough for the nonmoving party to point to any alleged factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) To survive summary judgment, the dispute must involve a genuine issue of material fact; that is, a fact that might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (noting that the "mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

Summary judgment is intended as a mechanism for isolating and disposing of "factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. To that end, the inquiry on summary judgment mirrors the directed verdict standard, and summary judgment should be entered when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (quoting *Matsushita Elec. Industrial Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If the nonmoving party bears the burden of proof at trial and fails to present "a jury question as to each element of its case", the motion for summary judgment must be granted. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). Given the focus of summary judgment on evaluating what a reasonable jury could find, courts may not consider hearsay evidence in reaching their conclusions. *Hartsel v. Keys*, 87 F.3d at 799. In considering a motion for

summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## III. *Law and Analysis*

As the parties dispute the meaning of particular provisions of the Letter Agreement, the Court begins its legal analysis by definitively interpreting the contract. It then considers the merits of both defendants' counterclaims and plaintiff's claims.

### A. Contract Interpretation

■ Under Ohio law, the purpose of contract construction is to "ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997); *Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). The intent of the parties is presumed to reside in the language they choose to use in their written agreement. *Kelly v. Med. Life Ins. Co.,* 31 Ohio St.3d 130, 509 N.E.2d 411, paragraph one of the syllabus, (1987). In construing a contract under Ohio law, the instrument should be read as a whole with the intent of each part gathered from a consideration of the whole. *Foster Wheeler,* 78 Ohio St.3d at 361–62, 678 N.E.2d 519. Where the terms of a contract are clear and unambiguous, the court cannot find different intent from that expressed in the contract. *E.S. Preston Assoc., Inc. v. Preston,* 24 Ohio St.3d 7, 10, 492 N.E.2d 441. If there is no ambiguity in the language of a contract, the court should not interpret words beyond their plain meaning or rewrite the contract to provide for a more equitable result. *Werner v. Cincinnati Ins. Co.,* 77 Ohio App.3d 232, 235, 601 N.E.2d 573 (1991); *Foster Wheeler,* 78 Ohio St.3d at 362, 678 N.E.2d 519. Common words in a contract will be given their ordinary meaning unless manifest absurdity results or unless some other

meaning is apparent from the face or overall contents of the document. *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph two of the syllabus, (1978).

■ On the other hand, language in a contract is ambiguous if it is reasonably susceptible of two or more meanings. *McClorey v. Hamilton Cty. Bd. of Elections,* 130 Ohio App.3d 621, 625, 720 N.E.2d 954 (1998) (citing *George H. Olmsted & Co. v. Metro. Life Ins. Co.,* 118 Ohio St. 421, 426, 161 N.E. 276 (1928)). Courts may consider extrinsic evidence to "to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham,* 76 Ohio St.3d at 313–14, 667 N.E.2d 949. Courts should endeavor to give effect to every part of the contract and therefore "if one construction of a doubtful condition in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." *Foster Wheeler,* 78 Ohio St.3d at 362, 678 N.E.2d 519 (citing *Farmers' Natl. Bank v. Deleware Ins. Co.,* 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus (1911)). Moreover, an ambiguous contract is to be construed against the party who drafted it. *Id.* at 314, 94 N.E. 834.

■ In this case, the parties dispute the meaning of compensation arrangement and billing procedures (paragraphs C.1. through C.4.) as they apply to creative work under the contract. Mansfield argues that, while conference reports and verbal approval can serve as interim approval for creative work, the contract requires HMP to submit written estimates to obtain proper approval to be paid for such work. (Docket # 76, at 5–6). Mansfield makes no distinction between the requisite

approval procedures for HMP to begin creative work and for it to place such work in final production. HMP, on other hand, argues that the contract establishes separate procedures for initiating creative work and for contracting or placing it in final production. Specifically, it contends that the approval of written estimates is not required to begin creative work, but rather that a conference report reflecting authorization by Mansfield was sufficient. (Docket # 82, at 3–4).

When provisions C.1., C.2., C.3., and C.4. are read together as a whole, the compensation arrangements and billing procedures for creative work are clear and unambiguous. C.1. explains that production cost estimates for creative work must be presented to Mansfield for approval prior to "contracting and/or placing creative work in final production." C.2. then sets forth the method by which that approval may be obtained. While Mansfield must ultimately approve written estimates before HMP contracts or places creative work in final production, conference reports may serve as interim approval. Because HMP alleges that no creative work was placed in final construction, a fact which Mansfield does not dispute, the procedures set forth in C.1. and C.2. are inapplicable to the disputes in this case.

Paragraph C.3. of the Letter Agreement is the provision most relevant to this case. It recognizes that "specific final costs cannot be estimated for creative projects until a project is completed through copy platform and layout" and that "[a] conference report and/or approved strategy work plan will serve as an authorization to *commence* work on creative projects." (emphasis added). While C.1. and C.2. apply only before contracting or placing creative work in fi-

nal production, C.3. sets the procedures for HMP to obtain approval prior to beginning creative work. In other words, a conference report serves as authorization to begin creative work and may serve as interim authorization for contracting or placing creative work in final production. Written estimate approvals are ultimately required only once creative work is contracted or placed in final production.[3]

The parties also disagree as to the meaning of the termination provision of the Letter Agreement which states that

> Termination of this agreement may be effected by either party on March 31, 2001, plus four months written notice, or at the end of subsequent 12–month periods plus three-months written notice; provided you shall pay HM & P the cost of all authorized work-in-process on the date of termination.

(Docket # 76, Ex. 1, at ¶ A.2.). On 29 March 2001, Mansfield gave HMP notice that it was not going to renew the Letter Agreement. In its second amended complaint seeking a declaratory judgment, Mansfield asks this Court to declare that the Letter Agreement expired according to its terms on 31 March 2001 and that it was not renewed by Mansfield (Docket # 40, at ¶ 19(a); Docket # 76, at 2). HMP agrees that the Letter Agreement was not renewed but argues that the four-month notice provision means that it was entitled to bill its retainer, the monthly minimum of $15,000, through 31 July 2001. (Docket # 81, at 10 and # 85, at 9).

The Court finds the termination provision in the Letter Agreement to be ambiguous as to the date on which notice of nonrenewal must be given. On the one hand, the provision could be interpreted to mean

---

**3.** It is also evident that C.4. is inapplicable in this case because it expressly states that the authorization procedures for commencing creative work are exempted from the limita-

tion that "[Mansfield] shall be responsible for only those costs specifically approved or for which such advance approval has been given."

that the Letter Agreement automatically renewed unless either party gave notice of non-renewal four months prior to 31 March 2001. On the other hand, it could mean that the Letter Agreement renews for an additional year unless either party gives notice of non-renewal on or before 31 March 2001. Under that second interpretation, proper notice of non-renewal means that the Agreement remains in effect for a four month period after notice was given.[4] Thus, since Mansfield gave its notice of non-renewal on 29 March 2001, the Letter Agreement either continued in effect until 30 March 2002 or 29 July 2001.

Mansfield urges the Court to construe ambiguous contractual provisions against HMP because it drafted the contract. (Docket # 76, at 7). HMP, however, denies Mansfield's suggestion that the contract was unilaterally drafted. (Docket # 82, at 4 n. 3, and # 85). While the issue of who authored the agreement is therefore a disputed fact, it does not turn out to be a material one. Assuming that HMP unilaterally authored the contract, the reasonable interpretation of the termination provision most advantageous to Mansfield would be that the contract continued in effect until 29 July 2001. HMP itself suggests this interpretation (Docket # 81, at 10 n. 4). Moreover, such an interpretation seems to be most consistent with the understanding and intent of the parties. At the time Sotak gave the notice of non-renewal, it was acknowledged that HMP's retainer was to be paid, according to the Agreement, through the end of July. (Dep. of Sotak, at 201–202, Ex. 46). Accordingly, the Court declares that Mansfield gave proper notice of non-renewal under the Letter Agreement and that the Agreement therefore expired on 29 July 2001.

## B. Defendants' counterclaims

The Court begins its analysis of the parties claims by examining defendant HMP's counterclaims. In its summary judgment motion, Mansfield argues that it is entitled to summary judgment on defendant HMP's counterclaims for breach of contract and unjust enrichment. (Docket # 76, at 1).

### 1. HMP's counterclaim for breach of contract

HMP contends that Mansfield materially breached the Letter Agreement by failing to pay HMP according to the terms of the Agreement despite HMP's full performance of its obligations under the Agreement and its demands for payment. (Docket # 46, at ¶¶ 31–40). Specifically, HMP seeks payment for a minimum monthly retainer and overages for the life of the Agreement, out-of-pocket costs, creative projects, and research, database, and PR projects. As of 31 July 2003, HMP claims that Mansfield owes it $523,092.61 for work that either had been completed but was never paid for or had been started but could not be finished because Mansfield would not allow any further work. (Cobb Decl. at ¶ 2).

In response, Mansfield argues that HMP cannot maintain its counterclaim for breach of contract because HMP failed to substantially fulfill its obligations under the contract thereby defeating its essential purpose. Specifically, it claims that HMP breached the contract by failing to produce usable sales support materials and by failing to obtain proper project approvals, according to the terms of the contract. Based on HMP's purported failure to comply with the terms of the contract, Mans-

---

4. The interpretation suggested by Mansfield, that the Agreement terminated on 31 March 2003, is unreasonable because it renders the four-month notice provision meaningless.

field argues that HMP is not entitled to any payments for the work it allegedly did.

In evaluating HMP's counterclaim for breach of contract, this court must both discuss the work allegedly done by HMP and address Mansfield's arguments that HMP is not entitled to payment for it. Because the Letter Agreement provides for alternate payment arrangements for different types of work, each type of service or cost is considered separately.

### a. Research, Database, and PR projects

■ Under this category, HMP argues that Mansfield owes it $160,000 for a Positioning and Segmentation Study. (Docket # 81, at 6 and # 84, at 8; Cobb Decl., Exh. A, 16692).[5] The Letter Agreement provides that Mansfield will pay for research, database, and PR projects "based on pre-approved costs negotiated in good faith." (Docket # 76, Ex. 1, Exhibit A). In September 2000, Sotak, in consultation with Mansfield's President, approved HMP to conduct this study after having received a written cost estimate of $160,000 plus or minus ten percent. (Dep. of Sotak, at 82–83 and 90–92, Ex. 17). HMP conducted the research using questionnaires Sotak helped design. (Dep. of Sotak, at 85–86 and 88, Ex. 17–21). On 29 January 2001, HMP presented the results of the study to Sotak. (Dep. of Sotak, at 93–94, Ex. 22). The work HMP did in conducting the study was consistent with Sotak's expecta-

tions and he authorized payment for it. (Dep. of Sotak, at 94–95).

Mansfield suggests that HMP's failure to obtain written approval of the cost estimate of the study precludes their claim for payment under the Agreement. (Docket # 76, at 7). The Letter Agreement does not, however, require such written approval. As noted above, HMP is entitled to compensation for projects based on pre-approved costs negotiated in good faith. In this case, Sotak, Mansfield's representative, approved the Positioning and Segmentation Study based on a written cost estimate. The fact that Sotak did not sign something authorizing the project is of no consequence because it is not required by the contract.[6] Since Mansfield approved the study and HMP completed it, HMP is now entitled to compensation for it.

### b. Creative Projects

HMP also claims that Mansfield has failed to pay it $107,421.36 for the following creative projects:

- *Creative Campaign Concepting* ("Waterworld" & "Perrysville"): HMP estimated $37,876.85 for these services. (Docket # 84, at 8; Dep. of Sotak, Ex. 57). HMP actually charged $43,596.26. (Cobb Decl., Exh. A, D5483).

- *Redesign of Mansfield's Logo:* HMP charged $15,000. (Cobb Decl., Exh. A, 16693).

---

5. The Court uses HMP's invoice numbers to further specify which document it is referring to in the Cobb Declaration.

6. Mansfield seems to suggest that a requirement of written approval can somehow be garnered from section C.7. of the Letter Agreement which provides:

   Research, production services, collateral charges will be billed upon completion of finished projects, except when we determine that progress billing is necessary. May be billed upon approval of written

estimates and final creative recommendations, payable within 30 days of date of invoice.

This provision, however, merely provides for the billing procedure and not what type of authorization is required in order for HMP to begin work on a research project. Even if it did somehow apply, nowhere does it imply that written approval is required. In this case, HMP completed the Positioning and Segmentation study and could therefore bill for its services at that time.

- *Color Recommendations:* HMP estimated and charged $3940. (Cobb Decl., Exh. A, D5490; Dep. of Sotak, Ex. 56).
- *Suite Naming:* HMP charged $3,228.75. (Cobb Decl., Exh. A, D5486).
- *Preparation of final layout and design of three print advertisements:* HMP charged a total of $16,820.49 for the work it did on three advertisements: "Waterworld" Ad # 1: "Come On In"; "Waterworld" Ad # 2: "The Proper Way"; and "Waterworld" Ad # 3: "Have You Ever." ($5,456.93, $5,456.93, and $5,906.63 respectively). (Cobb Decl., Exh. A, D5484, D5489, and D5485).
- *Preparation of final layout and design of two brochures:* HMP charged $14,284 for the work it did on an eight-page brochure targeted for use in consumer showrooms (Cobb Decl., Exh. A, D5482) and $16,271.27 for its work on a twelve-page brochure targeted to plumbers and builders (Cobb Decl., Exh. A, D5487).

Mansfield responds that HMP' breach of contract counterclaim must fail because HMP itself breached the express terms of the contract by failing to obtain proper project approvals. (Docket # 76, at 5). Specifically, Mansfield argues that it need not pay for any of HMP's creative work because Mansfield never signed written cost estimates submitted by HMP.

However, as discussed above, the Letter Agreement did not require HMP to obtain formal written approval of cost estimates in order to begin work on creative projects. Because none of these creative projects involved HMP contracting or placing creative work in final production, section C.3. governs the compensation arrangement at issue in this case:

> It is understood that specific final costs cannot be estimated for creative projects until a project is completed through copy platform and layout, and [Mansfield] will pay costs to date for any authorized project which is terminated in progress. A conference report and/or approved strategy work plan will serve as authorization to commence work on creative projects.

In other words, a conference report serves as authorization to begin creative work and Mansfield must pay costs to date for any authorized project which is terminated in progress. As demonstrated below, Mansfield authorized all of the creative work for which HMP still seeks payment.

Sotak approved HMP to engage in creative concepting at a meeting held on 29 January 2001, as memorialized in a conference report of that same date. (Dep. of Sotak, at 145–47, Ex. 38 and Ex. 39; Cobb Decl. at ¶ 4, Ex. B, 010).[7] Sotak then informed Cobb by email that one of those creative concepts, the "Water World" campaign, was accepted by Mansfield and that HMP was authorized to move forward with the campaign. (Dep. of Sotak, at 122–25, Ex. 34).

On 28 November 2000, Sotak approved HMP to develop new logo designs for Mansfield on the basis of a $15,000 estimate. (Dept of Sotak II, at 18–21, Ex. 52). HMP did develop new logo options, presented them to Sotak, and further revised them at his request. (Dep. of Sotak, at 120–22, Ex. 33 and Ex. 34; Cobb Decl. at ¶ 4, Ex. B, 009, 011, and 013). Sotak eventually informed HMP that a logo had been approved. (Dep. of Sotak, at 122–23, Ex. 34).

7. The Court uses the Conference Report Number to further specify which document it is referring to in the Cobb Declaration.

In a conference report dated 8 and 9 February 2001, Sotak also authorized HMP to review color trends and make recommendations for appropriate color choices to use for featuring new suites and to make recommendations for new suite names. (Dep. of Sotak, at 154–55, Ex. 40; Cobb Decl. at ¶ 4, Ex. B, 012). HMP subsequently developed recommendations for suite names and color trends. (Dep. of Sotak, at 155–56, Ex. 41; Cobb Decl. at ¶ 4, Ex. B, 013). Sotak was satisfied by the work produced by HMP. (Dep. of Sotak, at 155–56).

On 9 March 2001, HMP presented two creative campaigns to Mansfield and was instructed to proceed with developing cost estimates and budget parameters for collateral concepts.[8] (Dep. of Sotak, at 172, Ex. 43; Cobb Decl. at ¶ 4, Ex. B, 013). At this point, Mansfield had only decided to develop concepts for print advertisements and brochures, but no decisions had been made concerning the production of final products. (Dep. of Sotak, at 175–76). On 14 March 2001, Sotak informed Cobb by email that Mansfield had selected the "Water World" campaign and authorized HMP to move forward with the new logo and "Water World" campaign. (Dep. of Sotak, at 123–26, Ex. 34). On 29 March 2001, Sotak approved, as memorialized in a conference report, a cost estimate of $254,000 for HMP to proceed with the brochure development and "Water World" campaign photography for print advertisements. (Dep. of Sotak, at 178–79, Ex. 46; Cobb Decl. at ¶ 4, Ex. B, 014 (Revised)). Subsequently, on 3 April 2001, Mansfield ordered HMP to suspend its work on the Mansfield brand campaign. (Dep. of So-

tak, at 193–95, Ex. 50; Cobb Decl. at ¶ 4, Ex. B, 016; Cobb Decl. II at ¶ 4).

Having determined that HMP complied with the Letter Agreement in obtaining approval for its creative work, the Court next considers Mansfield's argument that HMP breached the Letter Agreement by failing to produce sales support materials. It is undisputed that HMP identified the production of sales support materials as an urgent need of Mansfield's as early as 22 May 2000. (Docket # 76, at 4, and # 82, at 7). HMP provided Mansfield with a document entitled "Mansfield Plumbing Ballpark Estimates" which provided cost estimates and a prospective timeline for projects initially discussed between HMP and Mansfield. (Docket # 76, Ex. 2; Dep. of Sotak, at 37–38). However, this document, produced by HMP at Mr. Sotak's request, did not authorize HMP to undertake any particular project.[9]

While the Letter Agreement and the parties themselves likely contemplated HMP eventually developing and producing sales support materials for Mansfield, HMP could not begin such work, according to the terms of the Agreement, without Mansfield's authorization. The Letter Agreement simply outlines the services that HMP will provide but does not specify any particular projects or set any definitive deadlines. Neither Sotak nor anyone else from Mansfield ever authorized or requested HMP to produce sales support materials for use during the Summer, Fall, or Winter of 2000, or for use during the first quarter of 2001. (Cobb Decl. II at ¶ 5). In fact, Mansfield did not select an advertising campaign or authorize the pro-

---

8. Collateral concepts are sales support materials, such as brochures. (Dep. of Sotak, at 172–73).

9. Mansfield likewise asserts that "it was clearly an expectation that sales/support product literature was of paramount importance

because that is how Mansfield sold and still sells its products." (Docket # 85, at 5). This, however, does not change the fact that Mansfield did not request or authorize HMP to produce any of that material until March 2001.

duction of sales support materials until March 2001. At that point, HMP began to produce the requisite sales support materials for a big trade show that was scheduled for the end of April. (Cobb Decl. II at ¶ 4). On 3 April 2001, Mansfield suspended all work on the campaign thereby preventing HMP from completing its work. Thus, while it is undisputed that HMP did not produce any final sales support materials during the duration of the contract, it is similarly undisputed that they were not authorized or requested to do so until March 2001 and that Mansfield terminated HMP's work prior to completion. HMP did not therefore breach the Letter Agreement.

HMP was authorized by Mansfield to work on all of the creative projects discussed above and either completed the projects or began the projects but could not finish them because Mansfield suspended its work. Because Mansfield's performance under the contract has not been excused by HMP's breach or otherwise, HMP is entitled to payment for those services equal to "third-party costs plus a 15% margin, and direct creative time plus a 20% margin." [10] HMP claims that it is entitled to $107,421.36 for its creative work and has submitted invoices reviewed and approved by Mr. Sotak. Besides arguing that HMP is entitled to nothing, Mansfield also contests the amount that HMP has billed for its services. (Docket # 86, at 2–3). This raises a factual dispute over which a reasonable jury could differ and therefore the issue of damages for this portion of Mansfield's breach of contract remains.

#### c. *General Marketing and Strategic Services*

■ HMP also alleges that Mansfield owes it $219,257.25 for general marketing and strategic services. The contract provides that general marketing and strategic services will be compensated at "the greater of (1) the monthly minimum of $15,000 per month, or (2) actual time cost" and that "[t]ime costs will be reconciled quarterly." (Docket # 76, Ex. 1, at C.5., Exhibit A). HMP submitted invoices for the monthly minimum of $15,000 for seven months in 2001 (January, February, March, April, May, June, and July). (Cobb Decl., at ¶ 2, Ex. A, 16640, 16781, 16836, R042001, D5491, D5492, D5493). In addition, HMP reconciled time costs for its marketing activities and provided Mansfield with invoices for overages—time charges in excess of monthly minimum charges—during the fourth quarter of 2000 ($49,899.50) and the first quarter of 2001 ($64.357.75), amounting to a total of $114,257.75. (Cobb Decl., at ¶ 2, Ex. A, 16720 and R2001). Alleging that Mansfield has not paid any of these invoices, HMP seeks $219,257.25 for the marketing services it provided. (Docket # 81, at 10–11).

Mansfield does not dispute its failure to pay for these invoices. Rather, it contends generally that its performance was excused because "HMP provided 'marketing services' to Mansfield which were unnecessary and not approved" (Docket # 86, at 5) and that "HMP fells short of its performance with respect to various projects undertaken with respect to their marketing efforts." (Docket 84, at 8). Essentially, it claims that HMP breached the Letter

---

**10.** Mansfield suggests generally that "HMP fell short of its performance with respect to various projects undertaken with respect to their marketing efforts" and "failed to meet the commercially accepted advertising standards." (Docket # 84, at 8–9). However, the only two specific examples it gives of HMP's inadequate performance involve the prior approval and sales support issues already dismissed above.

Agreement by failing to provide "useful sales support material" requested by Mansfield in a timely fashion. (Docket # 86, at 2). Such an argument, however, belies reality.

Mansfield did not approve the expenditure of funds for production of brochures and advertisements until 29 March 2001. (Dep. of Sotak, Ex. 46). Then, less than a week later, on 3 April 2001, Mansfield ordered HMP to cease all work and cancel the planned photography session. (Dep. of Sotak, at 194–97, Ex. 50). No final brochures or advertisements were produced because of Mansfield's own decision to stop work. Accordingly, HMP did not breach its duties under the Letter Agreement and is entitled to payment for its general marketing and strategic services for the $15,000 monthly minimum, a total of $105,000. While it may also be entitled to payment for its quarterly overages, a factual question remains regarding the actual time expended on general marketing and strategic services. The only evidence it has adduced in support of these charges are two general invoices and a few alleged examples of activities. Without more detailed information, it is impossible to determine the validity of these charges which are generally contested by Mansfield.

### d. *Out–of–Pocket Expenses:*

█ HMP claims that it is entitled to payment for $19,825 in out-of-pocket costs and cancellation fees associated with the cancelled photography session (Cobb Decl., Ex. A, D5488) and $10,868.62 for miscellaneous out-of-pocket expenses including postage, shipping, copies, travel, etc. (Cobb Decl., Ex. A, PR08–000346, PR07–000230, PR06–000178, PR05–000056, 17067, 16886, 16792, 16564, and 16694). The Letter Agreement provides that Mansfield would pay for "[p]ostage, shipping, mileage, telephone and telegraph, facsimile and other out-of-pocket expenses essential to the specific conduct of [Mansfield's] business" and out-of-pocket travel expenses. (Docket # 76, Ex. 1, at ¶ C.6.). It is undisputed that Sotak authorized HMP to arrange the photography session which Mansfield cancelled and that costs resulted. (Dep. of Sotak, at 178 and 200–201, Ex. 46; Cobb Decl. ¶ 6–8). Mansfield's failure to pay these costs is a breach of the Letter Agreement and HMP is entitled to the $19,825 in out-of-pocket costs. Mansfield does not specifically respond to the amounts claimed by HMP for its other miscellaneous out-of-pocket expenses or challenge their validity. However, since these charges were incurred in conjunction with HMP's marketing and advertising activities and since Mansfield contests the amount of those invoices, the precise issue of damages is again an unresolved factual issue.

### e. *Prejudgment Interest:*

Under Ohio law, prejudgment interest is awarded on a contract claim at a rate of 10 percent per annum unless a written contract provides for a different rate of interest. Ohio R.C. § 1343.03. The Letter Agreement specifies generally that Mansfield must pay "within 30 days of the date of invoice" but does not provide for a rate of interest for delinquent payments. (Docket # 76, Ex. 1, at ¶ C.7.) Accordingly, HMP is entitled to recover interest at the rate of 10 percent per annum on the money owed by Mansfield.[11]

---

11. HMP contends that it is entitled to interest at the rate of 1 ½% per month (or 18% annually) because such a finance charge was indicated on its invoices and Mansfield did not object. (Docket # 81, at 12–13). By neglecting to include finance terms in the written contract, HMP is relegated to collecting interest at the default rate of 10% annually. HMP's attempt to rely on its invoices is ineffectual as it directly contravenes the express language of Ohio R.C. § 1343.03.

### 2. HMP's counterclaim for unjust enrichment

■■ Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject. *Ullmann v. May*, 147 Ohio St. 468, 72 N.E.2d 63, syllabus paragraph and 478–79 (1947); *Randolph v. New England Mut. Life Ins.*, 526 F.2d 1383, 1387 (6th Cir.1975); *Williams v. Goodyear Aircraft Corp.*, 84 Ohio App. 113, 117, 85 N.E.2d 601 (1948). Such quasi-contractual remedies are generally not available where the parties are bound by a valid and enforceable contract. *Randolph*, 526 F.2d at 1387. In this case, the Letter Agreement is an express contract which governs the relationship between Mansfield and HMP. As HMP is entitled to damages for breach of contract, it may not simultaneously maintain a claim for unjust enrichment covering the same subject. Accordingly, Mansfield is entitled to summary judgment on HMP's unjust enrichment cause of action.

### C. Plaintiff's claims

Mansfield argues that, as of 31 March 2003, HMP "failed to meet the expectations of the work it was to perform." (Docket # 84, at 2). It therefore alleges the following claims in its second amended complaint: 1) Declaratory Judgement; 2) Breach of Contract; 3) Breach of the Covenant of Good Faith and Fair Dealing; 4) Unjust Enrichment; and 5) Action for Accounting (Docket # 40). By interpreting the contract and assessing defendant's counterclaims above, this Court has already effectively resolved a number of plaintiff's claims as well. Still, it addresses each claim in turn.

### 1. Declaratory Judgment

Mansfield seeks a declaratory judgment that the Letter Agreement expired by its terms on 31 March 2001, that it was not renewed by Mansfield, and that Mansfield is not responsible for any charges beyond 31 March 2001.[12] Based on this Court's interpretation of the contract, Mansfield is not entitled to the declaratory judgment it seeks. Although Mansfield gave proper notice of non-renewal under the Letter Agreement, the Agreement did not expire until 29 July 2001 and Mansfield is liable for $15,000 monthly charges for April, May, June and July as well as for the "costs to date for any authorized project which is terminated in progress." (Docket # 76, Ex. 1, at ¶ C.3. and Ex. A).

### 2. Breach of Contract

Mansfield's breach of contract claim consists primarily of its arguments that HMP failed to obtain proper approval for its creative work and failed to produce sales support materials. These arguments have already been considered and rejected by the Court. Mansfield also states generally, both in its complaint and its opposition brief, that HMP breached the contract by failing to provide quality work and appropriate personnel and services. However, the evidence in this case actually demonstrates the contrary. Sotak, Mansfield's Vice President of Marketing, authorized, approved, and was satisfied with all the work done by HMP. (Dep. of Sotak, at 140, 148–49, 155–56, 184; and Dep. of Sotak Vol. II, at 83, 87–88). Even viewing the evidence in favor of Mansfield, there are still no genuine disputes of material facts on its breach of contract claim and no

---

**12.** Mansfield also seeks a declaratory judgment that it is not required to pay "$254,000 for charges associated with an advertising campaign for photography that never took place and for 20,000 brochures that were never produced." (Docket # 40, at ¶ 19(d)). Mansfield's liability for these charges was already addressed during this Court's discussion of HMP's breach of contract claim, and, therefore, no further discussion is required.

rational trier of fact could find in Mansfield's favor. Accordingly, HMP is entitled to summary judgment on Mansfield's breach of contract claim.

### 3. Breach of the Covenant of Good Faith and Fair Dealing

■ In this cause of action, Mansfield alleges that HMP breach an implied covenant of good faith and fair dealing by billing for services not completed, by working on projects without proper approval, by failing to provide documentation as to work that was allegedly completed, by copying work created by Mansfield and representing it as its own original work, by using terms in proofs not used in the plumbing industry, and by conducting focus group studies of incorrect markets. (Docket # 40, at ¶¶ 35–41).

Ohio law does recognize an implied covenant of good faith and fair dealing with certain contracts, such as those between an insurer and insured and commercial contracts regulated by Ohio's Uniform Commercial Code. *Sammarco v. Anthem Ins. Cos., Inc.*, 131 Ohio App.3d 544, 555, 723 N.E.2d 128 (1998). Ohio law does not, however, impute such an implied covenant in every contract. *See e.g. Fodor v. First Natl. Supermarkets, Inc.*, 63 Ohio St.3d 489, 493, 589 N.E.2d 17 (1992) (Douglas, J. *concurring in the judgment*) ("We could, of course, find an implied covenant of good faith and fair dealing in this and every other contract but that would require a majority of this court to recognize such a covenant in employment relationships as well, a step a majority of this court has, unfortunately, refused to take.") When existent, the duty of good faith and fair dealing, in the commercial context, refers to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting." *Needham v. Provident Bank*, 110 Ohio App.3d 817, 832, 675 N.E.2d 514 (1996) (quoting *Kham & Nate's Shoes No. 2. Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990)).

This Court need not decide whether or not an implied covenant of good faith and fair dealing should be imputed to a contract which is not covered by Ohio's Uniform Commercial Code and which was negotiated by two sophisticated commercial parties, because, even if such covenant exists, Mansfield has failed to produce sufficient evidence upon which a reasonable jury could find a breach of that duty. As noted above, Mansfield's representatives authorized, approved, and were satisfied with all of HMP's work. Moreover, Mansfield's general allegations that HMP failed to provide appropriate personnel or perform services in a timely or commercially reasonable fashion are not supported by the evidence. With respect to the other allegations in its complaint that HMP misrepresented Mansfield's work as its own, used incorrect terms in proofs, and conducted focus group studies of incorrect markets, Mansfield has failed to produce any evidence of those allegations upon which a rational jury could find that HMP breached its duty of good faith and fair dealing.[13] HMP is therefore entitled to summary judgment on this claim.

### 4. Unjust Enrichment

As discussed above and as argued by Mansfield (Docket # 76, at 7–8), because a valid contract governs the relationship be-

---

13. Mansfield does offer throughout its briefs several unsubstantiated statements such as "the available market for Mansfield products is readily known or knowable upon simple inquiry, however, for reasons unknown HMP floundered and ignored its mandate and conducted irrelevant market studies." (Docket # 85, at 6). These unsupported allegations fail to present a dispute of a genuine issue of material fact.

tween Mansfield and HMP and the subject of this dispute, resort to a quasi-contractual remedy is both unnecessary and improper. Accordingly, HMP is entitled to summary judgment on this claim.

### 5. *Action for an Accounting*

Mansfield alleges in its second amended complaint that an accounting is necessary "[b]ecause of the complex nature of the course of dealings engaged in by the defendants and the failure of the defendants to account, Mansfield cannot determine amounts due to third party contractors from defendants." (Docket # 40, at ¶ 52). Specifically, it claims that HMP entered into contracts with third party contractors on behalf of Mansfield, that HMP received monies from Mansfield intended for third parties, and that it is unknown whether these funds have been properly remitted to the third parties. (Docket # 40, at ¶¶ 47–51). Mansfield's briefs are bereft of evidence supporting these allegations or the need for an accounting and fail to even seriously address this claim.

While HMP engaged the services of third parties in performing research services and creative work, it did not do so on Mansfield's behalf. Rather, it paid these third parties directly and simply incorporated the costs into the invoices it submitted to Mansfield in accordance with the Letter Agreement. (Cobb Decl. at ¶ 9). The only third party with whom HMP arranged to provide services directly to Mansfield and who remains unpaid is the photographer. HMP negotiated the cancellation fee for the photography session down to $19,825 and has already paid the photographer's out-of-pocket expenses. (Cobb Decl. at ¶¶ 6–8). However, as Mansfield has refused to pay HMP any fees related to the photography session, HMP has yet to receive any monies from Mansfield which are intended for third parties. Accordingly, no accounting is necessary, and HMP is entitled to summary judgment on this claim.

### IV. *Conclusion*

For the reasons set forth above, plaintiff's motion for summary judgment on defendants' counterclaims is granted in part and denied in part. Specifically, the motion is granted with respect to defendants' counterclaim for unjust enrichment but denied as to defendants' breach of contract claim.

In addition, defendants' motion for summary judgment on plaintiff's claims and its own counterclaims is granted in part and denied in part. Defendants' motion is granted with respect to all of the plaintiff's claims, which include breach of contract, declaratory judgment, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and an action for an accounting. With respect to its own counterclaims, defendants' motion is denied as to its unjust enrichment claim but granted with respect to liability on its breach of contract claim.

The issue of damages for Mansfield's breach of contract is, however, only partially resolved. Mansfield must pay HMP $160,000 for the positioning and segmentation study, $105,000 in monthly minimum charges for marketing services, and $19,825 for the cancelled photography session. HMP is also entitled to damages for their creative work, monthly overages for marketing services, and miscellaneous out-of-pocket expenses at an amount to be determined at trial. Defendants shall also receive prejudgment interest in the amount of 10 percent per annum on the final award.

IT IS SO ORDERED.