SAMMARCO et al., Appellants,

v.

ANTHEM INSURANCE COMPANIES, INC. et al., Appellees.

[Cite as *Sammarco v. Anthem Ins. Cos., Inc.* (1998), 131 Ohio App.3d 544.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–971074.

Decided Nov. 20, 1998.

546

548

*Waite, Schneider, Bayless & Chesley Co., L.P.A., Janet Abaray* and *Stanley M. Chesley,* for appellants.

*Thompson, Hine & Flory, L.L.P., Earle J. Maiman* and *Robert Johnson,* for appellees.

---

HILDEBRANDT, Judge.

Plaintiffs-appellants appeal from the trial court's judgment in which it dismissed all of their claims pursuant to Civ.R. 12(B)(6). We affirm that decision.

## I

## BACKGROUND

The claims in this case arise out of the merger of several health insurance carriers and the subsequent termination of the plaintiffs as physicians in the provider panel of the one insurance company resulting from the merger. In 1995, Community Mutual Insurance Company merged with Associated Group Insurance Companies. In 1996, Associated Group Insurance Companies changed its name to Anthem Insurance Companies, Inc. Anthem Insurance formed Community Insurance Company and transferred substantially all of the assets it had acquired in the merger with Community Mutual to Community Insurance. Community Insurance operates under the business name Anthem Blue Cross & Blue Shield.[1]

Each plaintiff contracted with Community Mutual to provide health care to patients in Community Mutual's health-care plans. Community Mutual assigned these contracts to Anthem Insurance following the merger of those companies. However, before the merger of the companies was effected, Community Mutual terminated the contracts of all the plaintiffs, and Anthem has continued to exclude plaintiffs from the panel of providers for patients in its health-insurance system.

Plaintiffs brought suit against all the above-mentioned insurance companies, claiming that they had been terminated without cause from the companies' provider panel and alleging causes of action based upon unjust enrichment, tortious interference with contract, breach of the implied covenant of good faith and fair dealing, wrongful discharge in violation of public policy, negligent misrepresentation, and fraud. The trial court granted the Civ.R 12(B)(6) motions of defendants, ruling that none of the causes of action alleged by plaintiffs stated a claim upon which relief could be granted.

To grant a Civ.R. 12(B)(6) motion, the court must analyze the complaint and conclude that the plaintiff can prove no set of facts entitling him to recovery.[2] All of the material allegations in the complaint are, for the purposes of this review, taken as true and all reasonable inferences made in favor of the plaintiff.[3] Appealing the trial court's dismissal of their claims, plaintiffs in this case raise

---

1. Defendant-appellee Paragon Health System administers the insurance plans involving Anthem Blue Cross & Blue Shield.

2. *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus.

3. See *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.* (1992), 65 Ohio St.3d 545, 548, 605 N.E.2d 378, 381.

five assignments of error, asserting, essentially, that their allegations, if proven, would entitle them to recovery on each of their claims. We review the trial court's dismissal pursuant to Civ.R. 12(B)(6) *de novo*.[4]

## II
## TERMINATION IN VIOLATION OF PUBLIC POLICY

First, plaintiffs claim that they have a valid cause of action for wrongful discharge in violation of public policy. The complaint alleges that the plaintiffs contracted with Anthem [5] to provide medical care to persons insured by Anthem, that Anthem unilaterally and without any reason other than its own profit motive terminated their contracts, and that such termination violates the public policy of Ohio.

As plaintiffs argue, Ohio law permits an employee whose contract of employment is otherwise at will to sue for wrongful discharge in violation of public policy.[6] The Ohio Supreme Court in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, stated at paragraph two of the syllabus:

"Henceforth, the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy."

Subsequent Ohio Supreme Court cases have fleshed out the elements of a public-policy claim and the recommended method of analysis of such a claim.[7]

To date, the public-policy exception as defined in *Greeley, Painter, Collins* and *Kulch* has been applied in Ohio only in the traditional employer-employee context as a tort claim for wrongful discharge. Clearly, in this case, plaintiffs make no contention that they were employed by Anthem. The contracts between the parties stated that plaintiffs, as members of Anthem's panel of medical providers, would be paid by Anthem for treatment rendered to certain patients (those whom

---

4. See *Elder v. Fischer* (1998), 129 Ohio App.3d 209, 717 N.E.2d 730, citing *Hunt v. Marksman Prod.* (1995), 101 Ohio App.3d 760, 656 N.E.2d 726.

5. The defendants in this case will be referred to collectively as "Anthem," as plaintiffs allege that all of the entities are agents or predecessors in interest of Anthem.

6. *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 149, 677 N.E.2d 308, 320; *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981; *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51.

7. See, *e.g., Kulch, supra; Painter, supra; Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653.

Anthem insured). These contracts were not the type of at-will employment contracts contemplated by the cases cited above.

However, plaintiffs claim that the termination of the contracts between them and Anthem violates public policy and should therefore not be permitted. Plaintiffs argue, "Because Ohio recognizes a public policy exception to termination at will in contracts of employment, this Court should similarly recognize a public policy exception to Anthem's termination at will provision in its provider agreements with plaintiffs."

 Ohio courts have recognized some public-policy limitations on the enforcement of certain contracts. It is a generally accepted rule that contract terms that violate public policy are unenforceable.[8] Also, restrictive covenants that purport to limit a physician's ability to practice medicine in a geographic area are scrutinized more carefully than similar covenants restricting other types of employment. In this context, courts have recognized that the greater scrutiny is mandated by public-policy considerations, since limiting the ability of a physician to practice may affect the public's ability to obtain medical care.[9]

 We hold that plaintiffs have failed to state a claim upon which relief can be granted. The at-will termination clause in the contract, unlike a noncompete clause, in no way prohibits a physician from treating certain patients and places no affirmative restrictions on the physician's ability to practice where and in the manner he wants. The contracts between the parties here are ultimately contracts for payment for authorized treatment. Even though not on Anthem's provider panel, the physician may still treat any patient who wants treatment, even those patients insured by Anthem—although the physician would have to require payment by the patient rather than the insurer. We find that the public policy discouraging restrictions on a physician's ability to practice medicine are not implicated in this case.

Ohio law also restricts the right of some insurers to terminate the insurance coverage of an individual *insured*,[10] but such limitations are imposed because of the special relationship between an insured and an insurer and "because of the great disparity between the economic positions of the parties to a contract of

---

**8.** See, *e.g., Med Controls, Inc. v. Hopkins* (1989), 61 Ohio App.3d 497, 573 N.E.2d 154.

**9.** See *Ohio Urology, Inc. v. Poll* (1991), 72 Ohio App.3d 446, 452–453, 594 N.E.2d 1027, 1031–1032.

**10.** See R.C. 3923.44(B)(1) (prohibiting a provider of long-term health care from canceling a policy for certain reasons); R.C. 3924.57(C)(1) through (2) and R.C. 3923.571(B)(1) through (2) (when a provider of individual health insurance and a provider of group health insurance may cancel a policy); R.C. 3937.31 (grounds upon which an automobile insurer may cancel coverage).

insurance * * *." *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 275, 6 OBR 337, 340, 452 N.E.2d 1315, 1319. There is no allegation in this case that a similar relationship exists between an insurance company and physicians or medical-care corporations.

Plaintiffs also refer to the following sources of public policy in support of their claims:

A person's right under the Ohio Constitution to protect his health as he sees fit.

The right of a woman to obtain medical services to abort a pregnancy.

A person's right to choose alternative medical care or refuse medical treatment for religious or personal reasons.

A patient's right to information relating to treatment before giving informed consent for a medical procedure.

The protection from disclosure of information provided by a patient to his physician.

The fiduciary duty owed by physicians to their patients.

Plaintiffs here also claim that the Ohio Constitution guarantees an individual the right to practice his profession "in any manner he sees fit," that arbitrary restrictions upon an individual's right to practice his profession are unconstitutional, and that Ohio law disfavors interference by private parties with another's property right to earn a living.[11]

As stated above, termination of the provider contracts at issue here for profit-related reasons does not interfere with a physician's freedom to practice medicine. We also hold that none of the constitutional provisions protecting a *patient's* right to treatment provides *physicians* with a cause of action for violation of public policy based on the termination of the physician-insurer contract.

Plaintiffs' argument that open access to medical care should not be subordinated to an insurance company's margin of profit undoubtedly appeals to patients and physicians alike. However, plaintiffs have failed to identify any public policy in Ohio that discourages businesses, even those in such public-welfare industries as health care, from profiting or increasing their profits. Although our state courts and legislature have placed some limits on the freedom of insurers to eliminate coverage in certain circumstances, the free-market philosophy reigns

---

11. While we have some reservations about whether the cases cited by plaintiffs clearly state a public policy in favor of an unfettered right to practice one's profession as he sees fit, we accept that premise for the purposes of reviewing the Civ.R. 12(B)(6) dismissal.

and most likely will continue to reign as long as individuals have access to adequate medical care—even if that care is not provided by a patient's first-choice physician.

Plaintiffs claim that this court should follow two decisions: one from the New Hampshire Supreme Court, holding that a physician had stated a cause of action for wrongful termination of his provider contract,[12] and the other an unpublished decision of the Federal District Court of New Jersey[13] permitting health-care providers to assert claims of violation of public policy arising from the termination of their provider contracts. Several significant differences between those cases and this one diminish the persuasiveness of the courts' reasoning.

The physician in the New Hampshire case alleged that his contract had been terminated because he questioned changes that the insurance company had made on his patient records. He argued that "public policy should condemn 'an insurance company which, upon receipt of a letter from a medical provider asking assistance in correcting * * * records of patient treatments, terminates the doctor's services.' "[14] Additionally, the physician was able to point to a specific provision in a New Hampshire statute that stated that "provider agreements must be 'fair and in the public interest,' " and the New Hampshire court held that this statutory provision prohibited the termination of a provider agreement for a reason that contravened public policy.[15]

Likewise, the plaintiffs in *New Jersey Psychological Assn.* claimed that their contracts were terminated because their treatment plans were not "managed-care compatible."[16] They alleged that the insurer knew that the treatment plans were medically necessary, though expensive, and still terminated their contracts. The court in *New Jersey Psychological Assn.* also referred to state regulations as a source of a policy that prohibited termination of provider contracts for the reason alleged by the plaintiffs as the basis for the termination of their contract.[17]

In this case, plaintiffs allege that the termination of their contracts for no reason, or, more specifically, so that Anthem could increase its profits, violates public policy. They identify no statutory provision that would prevent such a

---

**12.** *Harper v. Healthsource New Hampshire, Inc.* (1996), 140 N.H. 770, 674 A.2d 962.

**13.** *New Jersey Psychological Assn. v. MCC Behavioral Care* (Sept. 17, 1997), D.C.N.J. No. 96–3080, unreported.

**14.** *Harper,* 140 N.H. at 777–778, 674 A.2d at 967.

**15.** *Harper, supra.*

**16.** *New Jersey Psychological* at 3.

**17.** *New Jersey Psychological, supra.*

termination or any public policy that would be violated by termination of the contracts. They have not alleged, as the plaintiffs in the cited cases did, that the quality or availability of proper medical care would be compromised by termination of their contracts.

The most recently enacted Ohio statutory provision relating to this matter is R.C. 1753.09, which governs the termination of provider agreements by health-care corporations.[18] That section recognizes the right of a health-care corporation to terminate a provider contract if the corporation determines that its insureds' medical needs are being met and that the provider's services are unnecessary. While plaintiffs here complain that their contracts were terminated "simply in order to increase insurance company profits," without an allegation that the company's insureds' medical needs were not being met after the termination of the providers' contracts, Anthem's actions are not in derogation of the statute or the policy underlying the statute.

For all of the foregoing reasons, we overrule plaintiffs' first assignment of error.

## III

## VIOLATION OF GOOD FAITH AND FAIR DEALING

Plaintiffs argue that the termination of their provider contracts violated the covenant of good faith and fair dealing implicit in all contracts. However, we do not believe that the covenant of good faith and fair dealing has any application in this context.

Plaintiffs cite to two employment-termination cases, *Bolling v. Clevepak Corp.* (1984), 20 Ohio App.3d 113, 20 OBR 146, 484 N.E.2d 1367, and *Brown v. Otto C. Epp Mem. Hosp.* (1987), 41 Ohio App.3d 198, 535 N.E.2d 325, for the proposition that contracts in Ohio are subject to the requirement of good faith and fair dealing. However, the application of the good-faith-and-fair-dealing doctrine to employment contracts, notwithstanding *Bolling* and *Brown*, has specifically and consistently been rejected by the majority of Ohio courts.[19] Thus, is it not

---

**18.** Although this statute did not become effective until October 1, 1998, plaintiffs have pointed to no other statutory provision relating to the termination of provider agreements that expresses a contradictory policy, and the statute is in any event evidence of the Ohio General Assembly's policy on the matter.

**19.** See *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 105, 19 OBR 261, 265–266, 483 N.E.2d 150, 155; *Borowski v. State Chem. Mfg. Co.* (1994), 97 Ohio App.3d 635, 647 N.E.2d 230; *Edelman v. Franklin Iron & Metal Corp.* (1993), 87 Ohio App.3d 406, 622 N.E.2d 411; *Pyle v. Ledex* (1988), 49 Ohio App.3d 139, 551 N.E.2d 205; *Stumpf v. Cincinnati Inc.* (Dec. 26, 1997), Hamilton App. Nos. C–960605, and C–960632, unreported, 1997 WL 789401.

entirely correct to state, as plaintiffs have done, that every contract in Ohio is subject to an implied duty of good faith and fair dealing.

▮▮▮▮ Ohio does recognize that an implied covenant of good faith and fair dealing applies to some contracts, such as those between an insurer and an insured [20] and to commercial contracts regulated by Ohio's Uniform Commercial Code.[21] Assuming that such a duty exists in this case, we still hold that plaintiffs have failed to state a claim upon which relief can be granted.

▮▮▮▮ The existence of a duty of good faith and fair dealing between an insurer and an insured is based on the fiduciary duty imposed upon insurers. An insurer breaches the duty when it refuses to pay or settle a claim for an arbitrary or capricious reason. In executing the contract, the insurer's action must be predicated upon "circumstances that furnish reasonable justification therefor."[22] In the commercial context, the duty of good faith and fair dealing refers to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting * * *." *Needham v. Provident Bank* (1996), 110 Ohio App.3d 817, 832, 675 N.E.2d 514, 524.

▮▮▮▮ Here, plaintiffs do not allege that Anthem had a fiduciary duty to them, and they do not allege that some other special relationship existed between them that would justify imposition of a duty of good faith and fair dealing similar to that imposed on insurers in relation to their insureds. Further, plaintiffs' allegation that Anthem terminated their contracts solely to increase profits is simply another way of saying that the contracts were terminated for economic reasons. Legitimate economic interests cannot give rise to claims of bad faith or unfair dealing in this case. Ohio law does not prohibit for-profit health-care corporations, and the increase of profits is certainly a legitimate interest of a corporation. Thus, even if Anthem owed a duty to implement the contracts in good faith, plaintiffs admit that Anthem had an economically reasonable justification for terminating the contracts.

Plaintiffs' only allegation of bad faith or unfair dealing is the termination of their provider contracts for no reason other than Anthem's alleged profit motives. Applying the commercial-contract standard for good faith and fair dealing, we conclude that the termination of the provider contracts for no reason at all is specifically permitted by the contracts between the parties, so that Anthem

---

**20.** See, *e.g.*, *Eastham v. Nationwide Mut. Ins. Co.* (1990), 66 Ohio App.3d 843, 586 N.E.2d 1131; *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315.

**21.** See *Needham v. Provident Bank* (1996), 110 Ohio App.3d 817, 675 N.E.2d 514.

**22.** *Staff Builders, Inc. v. Armstrong* (1988), 37 Ohio St.3d 298, 303, 525 N.E.2d 783, 788; see, also, *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, syllabus.

cannot be said to have taken advantage of plaintiffs in a manner not contemplated by the contracts. We have already determined that the plaintiffs have failed to establish that such a clause is against public policy. Thus, there is no bad faith or unfair dealing in terminating the contracts in a manner specifically provided for in the agreements.

For the foregoing reasons, we hold that the trial court did not err in granting defendants' motion to dismiss plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

## IV

## TORTIOUS INTERFERENCE WITH CONTRACT

Tortious interference with a business relationship occurs when a person, without privilege, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or to perform a contract with another.[23] The elements of this claim require a plaintiff to prove that (1) a contract existed; (2) the alleged wrongdoer had knowledge of the contract; (3) the wrongdoer intentionally procured the contract's breach; and (4) the wrongdoer had no legitimate justification for causing the breach.[24]

Here, plaintiffs do not state a claim for tortious interference because they have not alleged facts to establish the third or fourth elements of this cause of action. A patient breaches no contract with a physician if the patient terminates the relationship, no matter the reason. Moreover, Anthem's action in removing plaintiffs from its provider list precluded payment by the insurer for any services rendered by the plaintiffs, but in no way required the patients to cease their particular physician-patient relationships.

We realize that, as a practical matter, a patient's choice of physician is influenced to a large extent by whether a particular insurance plan will pay for treatment. In the context of a claim for tortious interference with contract, however, plaintiffs must show more than a connection between the two acts; they must demonstrate that Anthem acted with the intent to cause the breach of the physician-patient relationship. Plaintiffs allege only that Anthem acted with the intent to increase its own profits.

Once again, we must point out that the contracts between the plaintiffs and Anthem permitted termination of the relationship at any time for no cause.

---

**23.** *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 651 N.E.2d 1283. See, also, *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235.

**24.** See *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, syllabus.

Committing an act specifically anticipated by the contract does not support a claim for tortious interference with a contract. We have already rejected the argument that public policy prohibits such a clause and that Anthem was under a duty of good faith and fair dealing in termination of the contracts, or, if it was, that it violated any such duty.

Finally, Anthem's "interference," if any, with the physician-patient relationship alleged here was privileged as a matter of law because the contracts between the parties were admittedly at-will, and plaintiffs have not stated any claim that could render that at-will termination clause unenforceable. Additionally, plaintiffs adamantly and repeatedly argue that Anthem's profit-motivated decision cannot be a good-faith or reasonable justification for terminating the contracts at issue. We have discussed at length above our holding that Anthem's profit motive does not show bad faith or unreasonableness, without a showing or at least an allegation that the patients' medical needs were being disregarded.

Plaintiffs' third assignment of error is overruled.

## V

## UNJUST ENRICHMENT

Plaintiffs' complaint also alleges a claim for unjust enrichment based on the termination of their contracts. Unjust enrichment occurs when one party confers some benefit upon another without receiving just compensation for the reasonable value of the services rendered.[25] Absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment, particularly when the express agreement contains a provision governing the allegedly inequitable conduct of the other party.[26] Because written contracts existed between the parties here, the trial court did not err by dismissing plaintiffs' claim of unjust enrichment.

## VI

## FRAUD AND NEGLIGENT MISREPRESENTATION

Plaintiffs' complaint contains a count for fraud and one for negligent misrepresentation. Because these causes of action contain many of the same elements, we consider these claims together.

---

**25.** See *Fox & Associates Co., L.P.A. v. Purdon* (1989), 44 Ohio St.3d 69, 541 N.E.2d 448; *Rice v. Wheeling Dollar Sav. & Trust Co.* (1951), 155 Ohio St. 391, 44 O.O. 374, 99 N.E.2d 301.

**26.** *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 55, 544 N.E.2d 920, 924; *Norton v. Galion* (1989), 60 Ohio App.3d 109, 110, 573 N.E.2d 1208, 1209; *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250, 661 N.E.2d 796; *In re Fleisch* (Sept. 25, 1996), Hamilton App. No. C–950282, unreported, 1996 WL 539797.

In their complaint, plaintiffs allege that defendants made a false statement and concealed material information regarding the merger of Community Mutual and Anthem. In a document entitled "Question & Answer, GHA/CMIC Joint Venture," defendants provided information about the joint venture in a question-and-answer format. One item stated:

"Q. Will the size of the Community Choice network be decreased?

"A. No. In fact, with GHA as a consultant in the network management area, Community Mutual plans to add 100 to 200 new physicians."

■ Plaintiffs further claim that defendants withheld from the provider physicians the fact that the joint venture was designed to change the insurance provider from a not-for-profit company to a for-profit company.

To establish a claim for fraud, there must exist:

"(1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance." *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, syllabus paragraph two.

Although we agree with the trial court that plaintiffs' allegations of fraud and negligent misrepresentation fail to state claims upon which relief may be granted, we do so for different reasons.

The trial court held that the complaint failed to allege that the number of physicians in the plan had decreased and that such an allegation was necessary to state a claim for fraud based on Anthem's representation that "the size of the Community Choice network [will not] be decreased." As plaintiffs argue, they did in fact include allegations in their complaint that defendants' statement in the joint-venture information pamphlet was false and that physicians (the plaintiffs) were in fact removed from the provider panel. Because defendants sought to dismiss plaintiffs' complaint pursuant to Civ.R. 12(B)(6), the court was required to treat all of the factual allegations in the complaint as true. Dismissal was not proper unless it appeared beyond doubt that plaintiffs could prove no set of facts entitling them to relief.

■ Under this standard, we hold that plaintiffs' allegations that the statement made by defendants was false and that some physicians were removed from the network were sufficiently pleaded to avoid dismissal pursuant to Civ.R. 12(B)(6).

■ However, we also hold that plaintiffs can prove no set of facts to establish that they relied on defendants' representations or, if they did, that their reliance caused them any damage. Plaintiffs allege that they relied upon the representations of defendants by "continu[ing] along with all other Anthem physicians to participate in" the network,[27] and that if they had known of defendants' true plans, they would have "independently exercised their right to terminate the Agreement to provide services * * *." [28] They then claim that defendants committed fraud by terminating their contracts when they had indicated that they would not do so.

Plaintiffs have failed to allege that they suffered any damages as a result of not being able to terminate the contracts before defendants did. They allege that termination of the contract, when they had been assured that the contracts would be continued, caused them to suffer damage in the loss of patients and income. Accepting their allegations as true, plaintiffs would have suffered the same damages from the loss of the contracts had they themselves terminated the contracts.

Plaintiffs make no allegation that, by continuing their contracts in reliance on defendants' statements, they were unable to become part of any other insurance plan's panel. They do not allege that, if they had known the truth, they would have been able to obtain replacement patients sooner so that the defendants' later termination of the contracts caused them to lose income that would not have been lost had plaintiffs been permitted to terminate the agreement earlier.

Because the reliance claimed by plaintiffs is the continuation of their contracts or, in other words, the nontermination of their contracts, there can be no damages based on plaintiffs' reliance on the allegedly false statement. In essence, plaintiffs claim that because of defendants' alleged misrepresentation, they were prevented from terminating the contracts with defendants before defendants terminated the contracts with them. Without any damages resulting from being beaten to the punch, plaintiffs have failed to allege provable damages as a result of their reliance.

■ Plaintiffs also predicate their fraud and negligent-misrepresentation claims on the defendants' failure to disclose their plan to change from a not-for-profit organization to a for-profit business. Omission or concealment of a fact may constitute fraud or misrepresentation when a duty to speak exists.[29] Plain-

---

**27.** Plaintiffs' Complaint at paragraph 85.

**28.** Plaintiffs' Complaint at paragraph 96.

**29.** *Burr, supra,* 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

tiffs have failed to identify or allege any duty on the part of the defendants to disclose this information about their business venture to plaintiffs.

For the foregoing reasons, we overrule plaintiffs' final assignment of error.

## VII

## CONCLUSION

We have reviewed the thorough, well-reasoned decision of the trial court, and we overrule all of the errors assigned to that decision. The judgment of the trial court dismissing plaintiffs' complaint for failure to state a claim upon which relief could be granted is affirmed.

*Judgment affirmed.*

SUNDERMANN, P.J., and GORMAN, J., concur.