SENECA VALLEY, INC., Appellant,

v.

VILLAGE OF CALDWELL, Appellee.

[Cite as *Seneca Valley, Inc. v. Caldwell*, 156 Ohio App.3d 628, 2004-Ohio-1730.]

Court of Appeals of Ohio,
Seventh District, Noble County.

No. 304.

Decided March 30, 2004.

Roetzel & Andress, Eric S. Bravo and John A. Zervas, for appellant.

Thompson Hine LLP, Michael W. Currie and W. Blair Lewis, for appellee.

---

WAITE, Presiding Judge.

{¶ 1} This appeal arises from the Noble County Common Pleas Court's decision to grant appellee, village of Caldwell ("Village") summary judgment in a contract dispute filed against the Village by appellant, Seneca Valley, Inc. Appellant alleged that the Village failed to pay for certain work performed under a construction contract and that this amounted to a breach of contract or, in the alternative, that the Village was unjustly enriched by appellant's services. For the following reasons, we affirm the judgment of the trial court.

{¶ 2} The contract at issue here was entered into on July 25, 2000. The Village accepted appellant's bid for the excavation and installation of a waterline referred to as the Sharon Waterline ("the Project") located in Caldwell, Ohio. The Village purchased the Project from Pure Water Company ("Pure Water").

{¶ 3} The factual history leading to this dispute arose as follows: Originally, Pure Water intended to run this waterline Project. Jeffery Dean ("Dean"), an engineer, created the original plans and specifications for the Project on behalf of Pure Water. Dean's contract with Pure Water ended after he created the plans and specifications. Pure Water intended to recontract with Dean to complete the Project after its approval by the county commissioners. The original plans depicted the waterline off to the side of County Road 60.

{¶ 4} Robert McElfresh ("McElfresh"), the president of Pure Water, presented the Project plans to Noble County Engineer John Foreman ("Foreman") in the year 2000. Foreman became involved in the Project because Pure Water needed approval to move the waterline into the roadway right-of-way, as opposed to the original plan, which was to have the Project built entirely off to the side of the road and on private property via easements.

{¶ 5} McElfresh had advised Foreman that one private property owner "did not want it [the Project] off the road right-of-way." Therefore, it was decided that if the Project was to be built, it had to be in the County Road 60's right-of-way only. Thus, in order to install the waterline, a portion of the roadway must be excavated. Dean was not aware of the right-of-way problem when he created the original plan and specifications.

{¶ 6} The Project plans, entitled 1996 Water Line Extension, contain aerial photographs of the Project area and illustrate the Project. The plans are also referred to as the Project blueprints or drawings. The black lines drawn on the exhibit were not on the original plans. McElfresh added the black lines to depict

the waterline's location in the roadway, since Pure Water was unable to secure the requisite easement to move it off to the side.

{¶ 7} On page one of the plans, McElfresh hand wrote: "NOTE: Some of the Water Line on C.R. 60 was moved off private property into the Roadway, due to the lack of Right of way." This note and the repositioned waterline shown by the additional black lines were on each set of plans.

{¶ 8} Thereafter, Foreman recommended the Project's approval to the County Commissioners in June 2000, once he confirmed that the plans corresponded with his discussions with McElfresh relative to the repositioning of the waterline.

{¶ 9} The Village subsequently purchased and took over the Project from Pure Water after McElfresh's modifications to the plans and after the plans were distributed to the bidding contractors. The Village apparently needed access to additional water.

{¶ 10} Thereafter, Pure Water provided the Village with all of the specifications, and it handed over all of the bids the day they were received. The Village hired Dean as its engineer for the Project.

{¶ 11} Stephen Hanson ("Hanson"), CEO of Seneca Valley, received the plans and specifications with the waterline clearly depicted in the roadway. The Project specified ten cubic yards of granular aggregate and ten square yards of asphalt for pavement restoration. Hanson contacted Dean before bidding relative to these amounts of materials. Dean advised Hanson to the effect that the contract would be taken care of via unit prices and that he should not be concerned. Subsequently, Dean sent the potential bidders a facsimile, which provided:

{¶ 12} "C. Road Crossing:

{¶ 13} "The road crossing is an open cut as indicated on the plans. Bid prices for the granular and asphalt replacement will be used to pay for this work. Quantities on the bid sheets are estimates. Bid prices for all items will be carefully evaluated."

{¶ 14} Hanson explained at his deposition that this facsimile, item C., referred to an area where the waterline crossed County Road 13. He also stated that the estimated quantities in question, based both on Hanson's conversation with Dean and item C., referred to the Project as a whole.

{¶ 15} Seneca Valley submitted the lowest bid and was awarded the Project contract on July 25, 2000. Thereafter, a preconstruction conference was held. Foreman, Village Mayor Allen Matthews, Dean, Hanson, and the highway superintendent, among others, were in attendance. Also attending was Stanley Michel ("Michel"), a Village water department employee, who was assigned by

the Village to the Project. Michel was the water department's "observer" for this Project.

{¶ 16} As the observer, Michel kept a daily log of the materials used by the contractor and generally confirmed that the job was done to the Village's satisfaction. He observed this Project from beginning to end. Michel testified that appellant "laid everything according to the specs."

{¶ 17} Certain changes to the contract took place where appellant submitted and had approved written change orders to the contract. Problems arose, however, over the provision involving fill and asphalt replacement.

{¶ 18} Hanson testified that his company placed approximately 1,380 cubic yards of granular aggregate and replaced 1,422 square yards of pavement at the Project site, allegedly pursuant to the original project specifications. A written change order was not issued for the placement of these materials.

{¶ 19} Because earlier change orders had been submitted and approved as to other issues, Hanson was fully aware that a change order signed by the mayor was required prior to a change in the Project. However, he stated that he understood the granular aggregate and pavement restoration were to be paid for solely by utilizing unit prices specified in the bid.

{¶ 20} When appellant submitted its partial pay estimate number one, the estimate indicated that appellant had installed eight cubic yards of granular backfill material. Partial pay estimate number one covered only "a couple days' work." The "quantity unit" for granular material was listed as ten. Hanson testified that eight cubic yards was the amount required for a residential driveway.

{¶ 21} The dispute herein apparently came to light when appellant submitted its partial pay estimate number two. It indicated that 1,351 cubic yards of granular material and 1,422 square yards of pavement restoration had been completed.

{¶ 22} Appellant subsequently received a letter dated October 10, 2000, from Dean that stated: "Item 8—Granular Backfill—A quantity increase over the bid quantity of this magnitude needed a request for change order, which I do not have." The letter also stated that appellant would not be paid for the additional pavement restoration, since the pavement restoration material was not the same as the bid item and thus, also, required a written change order. Appellant provided gravel pavement replacement, whereas the contract specified asphalt pavement replacement.

{¶ 23} Appellant subsequently filed suit for the Village's refusal to pay any amount over the bid price on May 25, 2001. The Village filed its motion for summary judgment following discovery between the parties, and appellant filed a

response. The trial court granted the Village summary judgment on September 9, 2002. Appellant filed a timely appeal.

{¶ 24} In order to grant a motion for summary judgment, a court must find that, construing the evidence most strongly in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A genuine issue of material fact exists unless it is clear that reasonable minds can come to but one conclusion and that conclusion is against the opposing party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150, 151, 66 O.O.2d 311, 309 N.E.2d 924.

{¶ 25} Civ.R. 56(C) provides:

{¶ 26} "* * * summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * *"

{¶ 27} Both parties in the instant case rely on the same uncertified copy of the contract. The proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56(C) is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56(E). *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 467, 20 O.O.3d 388, 423 N.E.2d 105. A court has discretion to consider documents other than those specified in Civ.R. 56(C) if there is no objection. *Brown v. Ins. Co.* (1978), 63 Ohio App.2d 87, 17 O.O.3d 267, 409 N.E.2d 253. It is apparent from the judgment entry granting summary judgment that the trial court considered the uncertified contractual agreement. Neither party objected because, as earlier stated, both relied on the same uncertified copy of the contract. Thus, we will accept this document and consider the contract in our de novo review.

{¶ 28} The construction of written contracts is a question of law. *Long Beach Assn., Inc. v. Jones* (1998), 82 Ohio St.3d 574, 576, 697 N.E.2d 208. Under a de novo review, an appellate court may interpret the language of the contract substituting its interpretation for that of the trial court. *Children's Med. Ctr. v. Ward* (1993), 87 Ohio App.3d 504, 508, 622 N.E.2d 692. If the contract is unambiguous, then there is no question of fact to be determined. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146. "However, if a term cannot be determined from the four corners of a contract, [a] factual determination of intent or reasonableness may be necessary to supply the

missing term." *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271, citing *Hallet & Davis Piano Co. v. Starr Piano Co.* (1911), 85 Ohio St. 196, 97 N.E. 377.

{¶ 29} Appellant's first assignment of error asserts:

{¶ 30} "The trial court erred in granting defendant-appellee Village of Caldwell's motion for summary judgment on plaintiff-appellant Seneca Valley, Inc.'s claim for breach of contract (September 9, 2002 journal entry.)"

{¶ 31} In order to prevail, appellant must demonstrate the existence of a contract, appellant's performance, a breach by the Village, and that appellant suffered damages as a result of the breach. *Allied Erecting & Dismantling Co. v. Uneco Realty Co.* (2001), 146 Ohio App.3d 136, 142, 765 N.E.2d 420.

{¶ 32} The existence of the contract is undisputed. It is also undisputed that appellant performed work beyond the specific base units set forth in the bid. The issue, however, is this: Was this a unit base contract (fixed price per unit but no set number of units) or a fixed bid base contract (one set price for completion of the job as a whole). Appellant argues that this was, at least in part, a unit base contract, and, thus, he was not required to submit a change order for units over the amount specified in the contract. Appellant claims that these units were merely an example or estimate. Appellee urges that this is a fixed bid contract and that setting unit prices within the contract was merely a convenience for calculation of the final bid and, in the event that the specific number of units listed in the contract was exceeded, was to be used in order to more easily facilitate a written change order. However, it is appellee's position that the bid submitted by appellant was clearly for the whole Project, and not an estimated or suggested amount the work might cost.

{¶ 33} In *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 678 N.E.2d 519, the Ohio Supreme Court reviewed a similar matter in which the contractor sought damages from the Franklin County Convention Facilities Authority ("CFA") for breach of contract. The contractor, Enviresponse, was hired to remove hazardous waste from the convention construction site. Id., 78 Ohio St.3d at 354, 678 N.E.2d 519. The specifications estimated the contaminated area to be 140 cubic yards. Id. The contract required written change orders by CFA for any additions, deductions, or alterations in the work. Id.

{¶ 34} The contract "change" occurred during Enviresponse's excavation when it recognized that additional remediation was needed, and its employees subsequently believed that they had oral authority to proceed with the additional work. Id., 78 Ohio St.3d at 356, 678 N.E.2d 519.

{¶ 35} In setting forth the law in *Foster*, the Ohio Supreme Court addressed law applicable to the matter before us:

{¶ 36} "It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor in compliance with the terms of the contract, unless waived by the owner or employer.

{¶ 37} "* * *

{¶ 38} "* * * [T]he meaning of any particular construction contract is to be determined on a case-by-case and contract-by-contract basis, pursuant to the usual rules for interpreting written instruments.

{¶ 39} "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. * * * 'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.'

{¶ 40} " 'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.' * * * Technical terms will be given their technical meaning, unless a different intention is clearly expressed.

{¶ 41} "* * *

{¶ 42} " '* * * [C]ourts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain.' " (Citations omitted.) Id., 78 Ohio St.3d at 360–362, 678 N.E.2d 519.

{¶ 43} After reviewing the contract in its entirety, the *Foster* court determined that the unit price was provided solely as a prenegotiated amount to be used in the event that an increase or decrease in the amount of work was later ordered. Id., 78 Ohio St.3d at 364, 678 N.E.2d 519.

{¶ 44} *Foster* also addressed the principal reason for written change orders:

{¶ 45} "* * * The primary purpose * * * is to protect the owner against unjust and exorbitant claims for compensation for extra work. It is generally regarded as one of the most effective methods of protection because such clauses limit the source and means of introducing additional work into the project at hand. It allows the owner to investigate the validity of a claim when evidence is

still available and to consider early on alternative methods of construction that may prove to be more economically viable. It protects against runaway projects and is, in the final analysis, a necessary adjunct to fiscal planning." (Citations omitted.) Id., 78 Ohio St.3d at 363–364, 678 N.E.2d 519.

{¶ 46} The primary contract document in the instant case is the four-page Agreement. It sets out 15 parts to the contract, which are identified as letters A–O and are referred to collectively as the contract documents. The contract documents, which include the Agreement, were identified collectively as Exhibit 21 at Hanson's deposition.

{¶ 47} The contract documents also include "A" Advertisement for Bids, and "B" Instructions to Bidders, which is apparently mislabeled in the Agreement as "B" Supplemental Information for Bidders. Exhibit 21 also includes "F," the General Conditions, "G," the Supplemental General Conditions, and "N," the Specifications.

{¶ 48} Throughout the contract documents, appellant is referred to as the bidder or contractor and the Village is the owner. In reviewing the contract documents in the order set forth in the Agreement, the term "unit price" is first mentioned in the Instructions to Bidders, which states in part:

{¶ 49} "In the Proposal, the bid price for each item shall include labor and materials. These unit prices shall be applicable in case of a change in the items required during the construction of the project and shall serve as the method of determining progress pay amounts."

{¶ 50} Appellant contends that there was no "change" in the required items, since it simply performed the job according to the drawings. As such, it claims that it is entitled to payment for all of its work at the specified unit prices.

{¶ 51} However, the Instructions to Bidders provides, under the section labeled Interpretation of Contract Documents:

{¶ 52} "If any * * * corporation contemplating submitting a bid for this Contract is in doubt as to the true meaning of any part of the Drawings, Specifications or other Contract Documents, he may submit to the Engineer a written request for an interpretation thereof. * * * Any interpretations of the proposed documents will be made only by an Addendum duly issued by the Engineer. * * * The Owner and the Engineer will not be responsible for any other explanations or interpretations of the Contract Documents made prior to the receipt of bids."

{¶ 53} The Bid Schedule, identified in the Agreement as "C" Bid, provides: "BIDDER agrees to perform all the work described in the CONTRACT DOCU-MENTS for the following unit prices or lump sum[.]" Each bid item was listed and numbered. The blank Bid Schedule set forth both the quantity and the

measurement unit for each listed contract item. Appellant, as a potential bidder, wrote in the price for each unit, then multiplied by specified units to fill in a total amount for that contract item.

{¶ 54} The two important items for our purposes are number seven, asphalt pavement restoration, and number eight, granular backfill material. The asphalt pavement restoration specifically listed a requirement of ten "SY" (square yards), and the required granular backfill material was listed as ten "CY" (cubic yards).

{¶ 55} The Notice of Award issued by the Village provided:

{¶ 56} "You are hereby notified that your BID has been accepted for items in the amount of **$103,040.00**." This was the total amount of all bid items. The notice of award nowhere mentioned unit prices.

{¶ 57} Thereafter, Hanson executed the lower left-hand corner of the Notice of Award under the words "Acceptance of Notice."

{¶ 58} Appellant argues that unlike *Foster*, supra, the contract at issue herein was not a bid base contract with pre-negotiated unit prices for subsequent authorized increases. Appellant claims that this contract was instead a pure unit contract that authorized payment for all necessary work done pursuant to the drawings and specifications at the designated unit prices. Appellant cites several inapplicable federal cases and decisions arising in other states in support of its argument that a change order is not required in a unit contract for a quantity increase.

{¶ 59} However, the General Conditions, under Section 14.1, Changes in Contract Price, support the Village's contention that the unit prices were pre-negotiated unit prices for dealing with post-contractual increases. Further, the specifications, which include the designated quantities, govern a conflict with the drawings or site conditions.

{¶ 60} The General Conditions section of the parties' contract initially sets forth definitions, which include:

{¶ 61} "1.6 CHANGE ORDER—A written order to the CONTRACTOR authorizing an addition, deletion, or revision in the WORK within the general scope of the CONTRACT DOCUMENTS, or authorizing an adjustment in the CONTRACT PRICE or CONTRACT TIME.

{¶ 62} "* * *

{¶ 63} "1.8 CONTRACT PRICE—The total monies payable to the CONTRACTOR under the terms and conditions of the CONTRACT DOCUMENTS.

{¶ 64} "* * *

{¶ 65} "1.13 FIELD ORDER—A written order effecting a change in the WORK not involving an adjustment in the CONTRACT PRICE or an extension of the CONTRACT TIME, issued by the ENGINEER to the CONTRACTOR during construction."

{¶ 66} Thereafter, the General Conditions under Drawings and Specifications provide:

{¶ 67} "4.2 In case of conflict between the DRAWINGS and SPECIFICA-TIONS, the SPECIFICATIONS shall govern. Figure dimensions on DRAW-INGS shall govern over general DRAWINGS.

{¶ 68} "4.3 Any discrepancies found between the DRAWINGS and SPECIFI-CATIONS and site conditions or any inconsistencies or ambiguities in the DRAWINGS or SPECIFICATIONS shall be immediately reported to the ENGI-NEER, in writing, who shall promptly correct such inconsistencies or ambiguities in writing. WORK done by the CONTRACTOR after discovery of such discrep-ancies, inconsistencies or ambiguities shall be done at the CONTRACTOR'S risk."

{¶ 69} In section 13, Changes in the Work, the General Conditions provide:

{¶ 70} "13.2 The ENGINEER, also, may at any time, by issuing a FIELD ORDER, make changes in the details of the WORK. The CONTRACTOR shall proceed with the performance of any changes in the WORK so ordered by the ENGINEER unless the CONTRACTOR believes that such FIELD ORDER entitles the CONTRACTOR to a change in CONTRACT PRICE or TIME, or both, in which event the CONTRACTOR shall give the ENGINEER WRITTEN NOTICE thereof * * *. Thereafter the CONTRACTOR shall document the basis for the change in CONTRACT PRICE or TIME within thirty (30) days. The CONTRACTOR shall not execute such changes pending the receipt of an executed CHANGE ORDER or further instruction from the OWNER."

{¶ 71} Thereafter, section 14, Changes in Contract Price, provides:

{¶ 72} "14.1 The CONTRACT PRICE may be changed only by a CHANGE ORDER. The value of any WORK covered by a CHANGE ORDER or of any claim for increase or decrease in the CONTRACT PRICE shall be determined by one or more of the following methods in the order of precedence listed below:

{¶ 73} "a. Unit prices previously approved.

{¶ 74} "b. An agreed lump sum." (Hanson Depo., Exh. 21, General Conditions, VC 0043.)

{¶ 75} The Supplemental General Conditions, identified in the Agreement as letter "G", provide in pertinent part:

{¶ 76} "1. GENERAL

{¶ 77} "These Supplemental General Conditions shall modify and supplement the General Conditions * * * and shall govern wherever they conflict in their meaning.

{¶ 78} "* * *

{¶ 79} "7. MEASUREMENTS AND QUANTITIES:

{¶ 80} "Where work is to be paid for by units of length, area, volume or weight, only the net amount of work actually done, as it shall appear in the finished work and as measured only inside of the payment lines described in the Specifications or shown or described in the Drawings, shall be paid for, local customs to the contrary notwithstanding.  * * *"

{¶ 81} Under the Measurement and Payment Section, Part 1—General, the Supplemental General Conditions provide:

{¶ 82} "1.02 Changes in Scope:

{¶ 83} "A. Additional payment may be made for unforeseen or unusual work and/or for major additions to the work in accordance with the provisions of the General Conditions.

{¶ 84} "* * * *

{¶ 85} "D. Adjustments in payments shall be made at unit prices bid and/or negotiated price as per contract conditions.

{¶ 86} "E. Additional pay items shall be allowed only when work is executed pursuant to a written change order or the Engineer's prior written instruction. A Change Order shall be issued in accordance with the General Conditions for all additional pay items."   (Hanson Depo., Exh. 21, Supplemental General Conditions, VC 0105.)

{¶ 87} In the Reference Standards section, the Supplemental General Conditions provide:

{¶ 88} "14.  FIELD ORDERS AND CHANGE ORDERS:

{¶ 89} "Any and all deviations from the original construction drawings and specifications will require written field orders or change orders as required under Article 10, Article 11, and Article 12 of General Conditions.  These documents, if approved, will be signed by the Owner.  Any changes made without these forms of written consent will be at the sole risk of the Contractor and no payment for said changes will be made."

{¶ 90} Appellant claims that the contract was "clarified" by Dean, when Dean orally indicated that the bid quantities were estimates.  Appellant asserts that since the engineer had the authority to interpret the contract documents, said quantities in excess of the total stated units must be paid at the unit prices.

Pursuant to the parties' contract and the clear direction in the bid documents, Dean's "clarification," however, cannot serve to authorize payment in excess of the base quantities.

{¶ 91} Appellant argues that it was clear that additional materials in excess of the base bid quantities were needed from the beginning. For instance, appellant restored 1,422 square yards of pavement at the Project site while the base bid unit quantity was only ten square yards. As earlier stated, appellant argues that a residential driveway project, much smaller in scope, requires approximately eight square yards.

{¶ 92} However, the Village contends that the base bid amounts could have been sufficient had appellant not encountered unforeseen difficulties, specifically large rocks beneath the road that left voids and caused increases in the replacement materials. Apparently, the usual procedure after excavation is to save the material excavated and replace this in the excavated site. Any deficiencies once these materials are placed is then filled from the contracted materials. The Village points out that even when a contractor encounters unforeseen conditions that then necessitate additional materials and labor, the contract required a written change order in advance of additional payment.

{¶ 93} The Village also indicates that appellant's pavement restoration was not the type specified in the bid. Bid item number seven identified asphalt pavement restoration. However, appellant submitted not only additional amounts of material, but these were for gravel pavement, not asphalt restoration. Gravel pavement restoration was not included in the contract, and thus it would constitute an addition or substitution and require a written change order.

{¶ 94} It seems that appellant misinterpreted the contract based on the inconsistencies it perceived between the drawings and the designated unit price quantities. While appellant interpreted the contract and Dean's statements in a manner that seemed to explain its perceived discrepancy, appellant failed to follow the designated procedure in order to guarantee that its interpretation was correct. Appellant failed either to request written explanations prebid or file for change orders once the work was underway.

{¶ 95} The Village's acceptance of appellant's bid provides the best evidence of the extent of the contract. It provides: "You are hereby notified that your BID has been accepted for items in the amount of $103,040.00." The bid was accepted clearly based on a finite amount of money. The acceptance does not refer to unit prices.

{¶ 96} In reviewing the contract documents as a whole, and in giving meaning to all parts of the contract documents, appellant was required either to secure an addendum explaining the manner in which the contract was to function prior to

performing any work in excess of the total original contract price or was required to secure a written change order once the work had begun on the project.

{¶ 97} Further, the fact that the base bid quantities may have been estimates does not eliminate the change-order requirement for work or quantities in excess of the estimates. This contract unambiguously requires a written change order in advance of any additional pay items.

{¶ 98} As in *Foster,* supra, the unit prices herein are prenegotiated prices to be used in the event that changes in the work were later authorized. Appellant's asserted interpretation would essentially invalidate the contract's written change order requirement. Absent prior authorization, one cannot simply exceed the scope of a written contract and subsequently demand payment. Based on the foregoing, the first argument in appellant's first assignment of error lacks merit.

{¶ 99} Appellant also asserts under this assignment of error that the result of this case, if affirmed, causes an absurd result which is contrary to law. Appellant argues that the specified quantity, i.e., ten square yards of asphalt restoration, provided for in the contract was only enough to resurface one driveway and was clearly insufficient to resurface a road for approximately one-half mile.

{¶ 100} However, as the Ohio Supreme Court addressed in *Foster,* supra, it is not a court's position to guarantee that a contract has equitable results: "A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.' " Id., 78 Ohio St.3d at 362, 678 N.E.2d 519, citing *Ohio Crane Co. v. Hicks* (1924), 110 Ohio St. 168, 172, 143 N.E. 388.

{¶ 101} While the outcome herein may render unfortunate results for appellant, it is not the function of this court, or any court, to construe an otherwise unambiguous contract in order to achieve equitable results. *Foster,* 78 Ohio St.3d at 362, 678 N.E.2d 519. Instead, the contract, when read as a whole, dictates the outcome. Id.

{¶ 102} Appellant also claims under its first assignment of error that the Village waived its rights under the contract via its representative's approval of the daily work in excess of the initial bid item quantities. In support of this argument, appellant asserts that the Village representative's act of recording the quantities of materials used in his daily log operates as a waiver to the written change order requirement. There is no dispute that Michel recorded quantities of the disputed items in excess of the designated base bid item quantities. Notwithstanding:

{¶ 103} "It is generally recognized that, in the absence of express authority, an engineer, * * * or inspector in charge of or assigned to public

building or construction work has no power to waive or modify a stipulation requiring a written order for alterations, even where that person may authorize alterations in writing." Id., 78 Ohio St.3d at 364, 678 N.E.2d 519, citing *Baltimore & Ohio RR. Co. v. Jolly Bros. & Co.* (1904), 71 Ohio St. 92, 72 N.E. 888, at paragraph one of the syllabus. Thus, absent a written authorization or waiver, common agency waiver principles are inapplicable to government construction contracts. Id.

{¶ 104} In fact, the Ohio Supreme Court in *Foster* addressed this issue and held that "mere knowledge, and even acquiescence, is not enough for recovery." Id., 78 Ohio St.3d at 364, 678 N.E.2d 519, citing *Lathrop Co. v. Toledo* (1966), 5 Ohio St.2d 165, 174, 34 O.O.2d 278, 214 N.E.2d 408. "[P]roof of a waiver must either be in writing, or by such clear and convincing evidence as to leave no reasonable doubt about it." *Foster,* 78 Ohio St.3d at 364, 678 N.E.2d 519, citing *Ashley v. Henahan* (1897), 56 Ohio St. 559, 47 N.E. 573, paragraph five of the syllabus.

{¶ 105} The contract documents in the instant case do not provide that the Village water department employee, acting as an "observer," had authority to authorize contract quantities orally or even in writing. There is no evidence of or any claims of an express waiver by the Village. In fact, the bid contract documents themselves negate such a claim. As such, and based on the foregoing, appellant's waiver argument lacks merit.

{¶ 106} Thus, all of appellant's arguments under its first assignment of error lack merit and are hereby overruled.

{¶ 107} Appellant's second assignment of error asserts:

{¶ 108} "The trial court erred in granting defendant-appellee Village of Caldwell's motion for summary judgment on plaintiff-appellant Seneca Valley, Inc.'s claim for unjust enrichment (September 9, 2002 Journal Entry.)"

{¶ 109} Appellant initially asserts that the trial court's decision to grant the Village summary judgment as to appellant's second cause of action was improper. appellant claims that the Village's motion sought summary judgment only as to appellant's breach of contract claim.

{¶ 110} Pursuant to Civ.R. 56(C), summary judgment is proper if:

{¶ 111} "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

{¶ 112} In support of this argument, appellant relies on the decision in *Marshall v. Aaron* (1984), 15 Ohio St.3d 48, 15 OBR 145, 472 N.E.2d 335. However, *Marshall* held that a court cannot sua sponte grant summary judgment to a party where that particular party never filed a motion for summary judgment, even when another party to the same suit had requested summary judgment. Id., 15 Ohio St.3d at 50, 15 OBR 145, 472 N.E.2d 335.

{¶ 113} In the instant matter, the Village requested summary judgment as to appellant's complaint; it did not request summary judgment as to appellant's breach of contract allegation only. And while appellant correctly points out that the Village did not specifically address the claim of unjust enrichment in its summary judgment motion, appellant does not assert that it was denied the opportunity to set forth relevant evidence on this issue.

{¶ 114} Further, while not specified in its entry, the trial court may have likely concluded that its ruling on the breach of contract claim rendered appellant's unjust enrichment claim moot.

{¶ 115} Unjust enrichment occurs when one party bestows a benefit on another party or individual, "without receiving just compensation for the reasonable value of the services rendered." *Sammarco v. Anthem Ins. Cos., Inc.* (1998), 131 Ohio App.3d 544, 557, 723 N.E.2d 128, certiorari granted (1999), 85 Ohio St.3d 1446, 708 N.E.2d 211, appeal dismissed (1999), 87 Ohio St.3d 1227, 719 N.E.2d 963.

{¶ 116} The law relative to unjust enrichment actions when a written contract exists between the parties provides:

{¶ 117} "Absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment, particularly when the express agreement contains a provision governing the allegedly inequitable conduct of the other party." *Sammarco*, 131 Ohio App.3d 544, 557, 723 N.E.2d 128. See, also, *Youngstown Buick Co. v. Hayes* (Oct. 26, 2000), 7th Dist. No. 98 CA 159, 2000 WL 1635710.

{¶ 118} Again, it is clear that the parties herein had a written contractual agreement. Further, the terms of the contract specifically address the dispute herein, i.e., the unit prices, specified base bid, and the written change order requirement. Finally, appellant does not claim that the Village acted illegally or fraudulently. As such, appellant's second assignment of error lacks merit.

{¶ 119} Accordingly, appellant's assignments of error are hereby overruled, and the trial court's decision to grant summary judgment in favor of the Village is affirmed in its entirety.

Judgment affirmed.

VUKOVICH and DEGENARO, JJ., concur.