[Cite as *Williams v. Edgell*, 2024-Ohio-2129.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

BILLY J. WILLIAMS ET AL.,

Plaintiffs-Appellees,

v.

CHRIS EDGELL ET AL.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CO 0013**

---

Civil Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2021 CV 360

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed in part. Reversed and Vacated in part.

---

*Atty. Mark A. Hutson*, for Plaintiffs-Appellees and

*Atty. Carl J. King,* for Defendants-Appellants.

Dated: June 3, 2024

**DICKEY, J.**

**{¶1}** Appellants, Chris Edgell ("Edgell") and Edgell Construction, LLC ("Edgell Construction" or "company"), appeal the decision and judgment entry of the Columbiana County Court of Common Pleas awarding damages in the amount of $14,586.16 to Appellees, Billy Joe and Betsy Williams following a bench trial in this action for breach of contract and unjust enrichment. Both sides agree they entered into an oral contract for the construction of a 40' x 60' pole building. Appellees successfully argued at trial the pole building was not constructed in a workmanlike manner.

**{¶2}** Appellants advance two assignments of error. First, they argue the judgment entry is against the manifest weight of the evidence. Second, they contend the trial court erred in concluding they were unjustly enriched by Appellees, insofar as the parties agree an express agreement existed regarding the construction of the pole building. For the following reasons, the decision and judgment entry is affirmed in part, as it relates to the breach of contract claim, and reversed and vacated in part, as it relates to the unjust enrichment claim.

## FACTS AND PROCEDURAL HISTORY

**{¶3}** Five witnesses testified at the December 14, 2022 bench trial: Appellees ("Billy Joe" and "Betsy"), and Keith English ("English"), who performed an inspection of the pole building, on behalf of Appellees; and Edgell, and Gary Pankuch ("Pankuch"), the foreman of Edgell Construction, on behalf of the company.

**{¶4}** In the spring of 2020, Appellees elected to remove an impractical 24' x 34' barn[1] from their property located in Columbiana County and build a four-bay garage. Billy Joe, who worked for his father's construction company when he was a teen, first considered purchasing a building kit, which would require assembly and installation by Appellees. Daunted by the amount of work required with a building kit, Appellees chose instead to hire a local contractor.

---

[1] The barn was destroyed by the West Point Fire Department in a controlled burn training exercise on May 6, 2020.

{¶5} After seeking recommendations from various lumber suppliers, Appellees solicited estimates from several construction companies. Billy Joe explained "[it is] hard to get [contractors] to show up," but he was able to acquire bids from two companies. (Trial Tr., p. 85.) Edgell, who testified he had constructed between 200 to 300 pole barns in the past, visited the property and formulated a bid for a 40' by 60' pole building based on Appellees' planned use for the structure.

{¶6} Edgell testified the site "should have been a little bit more level [than] it was" (he estimated that "there was about four foot [sic] from end to end that was off") and "once [ ] the pole barn [was built] there was about five foot [sic] of fill that needed put in this pole barn." As a consequence, Edgell recommended an excavator that he had used on roughly 100 previous jobs. However, Appellees chose to employ the excavator who was currently constructing a pond on their property. (*Id.*, p. 201-203.) The parties agreed that Appellees would be responsible for the cement and electrical work and the gutter installation after construction of the building was complete.

{¶7} Billy Joe testified he asked Edgell if Edgell "would want to write up a – more or less formal agreement." Edgell responded, "No, [I am] a man of my word, do a handshake thing, and [it will] be fine." (*Id.*, p. 89.) Edgell did not dispute that he declined to execute a written agreement.

{¶8} Edgell quoted a price of $26,000 for the building and $5,600 for the garage doors. Appellees testified Edgell intended to acquire the garage doors from a local company. Billy Joe testified that Edgell agreed to pay the cost of the installation of the garage doors. Betsy similarly testified that Edgell agreed to pay "Hayd[e]n Wright" to install them. (*Id.*, p. 180.)

{¶9} Edgell testified the company does not install garage doors, and at the time the oral contract was entered, he regularly recommended Hayden Wright as a garage door installer to his customers. He denied having offered or agreed to pay for the installation of the garage doors.

{¶10} Appellees paid $13,000 in cash to Edgell on April 17, 2020 as a down payment, which Edgell used to purchase materials for the job. Construction materials were purchased on April 20, 2020 from Tri-State Metal Sales.

**{¶11}** Construction began on May 13, 2020 and concluded five days later. Pankuch, who testified that he had constructed over 2000 pole buildings in the past, oversaw the construction with Edgell. Edgell testified the project crew as constituted had previously constructed roughly 100 pole buildings.

**{¶12}** At some point during construction, Edgell destroyed two pots containing tomato plants in Appellees' driveway. Edgell testified he drives a large truck and was not aware that he had broken the pots. When Appellees discovered the damage to the pots, they asked Edgell to replace them.

**{¶13}** On May 13, 2020, Appellees made an additional payment of $3,000 in order for Edgell to "meet payroll." (*Id.*, p. 92.) On May 15, 2020, Appellees made a cash payment in the amount of $5,600 for the garage doors. On May 19, 2020, Appellees made a final cash payment in the amount of $10,000. Appellants concede the contract was paid in full.

**{¶14}** Edgell testified he discovered on the first day of construction that Appellees' excavator "had dug three foot [sic] [of dirt] out of the wrong side of the building when [Edgell] told him where to dig." (*Id.*, p. 209.) Edgell explained "that raises the building up out of the ground. It's way more fill that needs to go in, and then it shortens the poles on the gables." (*Id.*, p. 210.) Edgell remedied the situation by using 20-foot poles instead of 16-foot poles. He testified 20-foot poles are the longest treated poles available. Pankuch likewise testified the grade of the property was "severely off" requiring the use of longer poles. (*Id.*, p. 277.)

**{¶15}** During construction and for several months following, Appellees were occupied with the care of Billy Joe's father, who was an invalid and required near constant care. After he passed on July 13, 2020, Appellees were occupied with the administration of his estate. As a consequence, the cement and electrical work for which Appellees were responsible was delayed.

**{¶16}** Gutters were installed on June 29, 2020. The gutter installer informed Billy Joe that there was no drip edge on the building, and the bottom row of screws, front and back, had not been installed. The gutter installer furnished the drip edge and screws and installed them free of charge.

**{¶17}** The interior floor was poured on July 26, 2020 and the exterior concrete on August 24, 2020. Billy Joe testified "a lot of deficiencies [in the workmanship of the building construction] got pointed out to [him] by the concrete guys." (*Id.*, p. 98.)

**{¶18}** Appellees testified the summer of 2020 was unseasonably dry. After a rare storm, Appellees noticed five different water leaks, as well as pools of water inside the west end of the building, which were previously masked by the gravel floor.

**{¶19}** Appellees offered a series of photographs taken on September 1, 2020, depicting leaks from the roof trickling down the walls, as well as dimples in the exterior metal walls allegedly caused by "over-torqued screws," which were driven into the rubber washers. (*Id.*, p. 107.) Billy Joe also photographed crooked exterior screws that did not connect with the wood studs or panels inside the building, as well as crooked posts, and what he perceived to be a "curved wall." (*Id.*, p. 114.)

**{¶20}** Billy Joe testified he also believed the end posts on the building were too short because 2x4 boards were used to extend the posts to the top of the structure. However, he could not be certain at the time the posts were too short as he had never constructed a pole building.

**{¶21}** According to Billy Joe, he contacted Edgell in August to discuss the defects in the construction. According to a lengthy text message chain offered by Edgell and admitted into evidence, it was Edgell who contacted Appellees after he heard from a third party that Appellees were unhappy with the finished product. The text message chain reads, in relevant part:

Edgell: Is there something wrong with your building 8 [sic] over heard some talk you wasn't [sic] happy with something

Billly Joe: Had 3 different contractors say mistakes were made, I'll fix them. But no drip edge on back that was left off but gutter guy mended that and both front and back bottom rows is [sic] screws that been [sic] left out on the roof, gutter guy fixed that too. Don't ask who contractors were not trying to offend me actually one apologized to me for him even mentioning it. But

> like I said ill [sic] fix issues. still waiting on 2 pots that got busted up
>
> Edgell:  I will fix anything that is not good I don't want people talking about bad work Just need to know what isn't to your liking can't fix it without knowing.
>
> Billy Joe:  Ok we can meet Monday [sic] if u want when garage door guy is here, mistakes that were pointed out to me I just said I'll fix them it is what it is * * *
>
> Edgell:  Ok if I would have known sooner it would have been corrected * * *
>
> Billy Joe:  4 small roof leaks in building 1 pretty good leak also

The parties agree that Edgell and Pankuch returned to the construction site on August 31, 2020 to address Appellees' concerns.

{¶22} Appellants' predominant mode of advertising is social media. As a consequence, each completed project is photographed and posted to Edgell Construction's Facebook account. Appellants offered twelve photographs of the pole building immediately following completion, which depict plumb posts. Edgell testified that all the posts were plumb on May 18, 2020, and in the event he discovered a post out of plumb, it would have been corrected.

{¶23} Nonetheless, Edgell conceded at trial that several of the posts were not plumb on August 31, 2022. According to Edgell, Billy Joe confessed the excavator had hit the building five times while he was spreading fill. Specifically, Edgell testified Billy Joe said he had to "get on [his] dirt guy for hitting the building." (*Id.*, p. 218.) On cross-examination, Edgell testified the building was hit six times. (*Id.*, p. 257.)

{¶24} Edgell explained six inches of "lift" (fill) must be added first inside of the building, then outside, then the fill must be compacted. The process is tedious, as it must be performed incrementally, otherwise the unequal pressure from one direction will "push the building." (*Id.*, p. 221.)

**{¶25}** Edgell further testified the fill work is performed with equipment weighing thousands of pounds, for instance, a skid-steer weighs roughly 12,000 pounds and a vibrating roller weighs between 7,000 and 8,000 pounds. As a consequence, any carelessness or momentarily lapse in concentration by the equipment operator can result in inadvertent contact with the building. Edgell testified he attempted to fill a building on his own property and inadvertently hit the structure twice before he relinquished the task to his father-in-law. Pankuch provided similar testimony regarding the tedious process of adding fill and the possibility of hitting the building during the process.

**{¶26}** Betsy was asked to describe her involvement "with the garage." (*Id.*, p. 168.) She responded:

> I would come home from work and ride – run that roller around a little bit and not – very little. It involved – once the contractor come [sic] and was dumping the shale and they were filling the building, I would go down for maybe an hour or so and run – run the roller and help pack some dirt in, but not – not very much.

(*Id.*)

**{¶27}** Edgell testified a photograph offered by Appellees and admitted into evidence – Plaintiffs' Exhibit 2, depicts a rip in the metal of the building. Edgell further testified the photograph establishes the building had moved as a result of being hit. Despite the fact that Billy Joe (according to Edgell) admitted the damage to the building was caused by the excavator, Edgell testified he was willing to repair the leaks because he did not want a disgruntled customer ruining the company's reputation.

**{¶28}** Appellees demanded a new roof. However, Edgell suggested he would prefer to first install larger screws, which he believed would seal the leaks. He testified installing larger screws was simply the first step in his plan to fully rectify the problems, but he was willing to undertake any fix, up to and including a new roof, to satisfy Appellees.

**{¶29}** Both Edgell and Pankuch testified Betsy became irate when Edgell suggested installing larger screws and she began loudly cursing at Edgell and demanding

a new roof. As a consequence, Edgell walked away from the conversation, leaving Pankuch to resolve the matter on behalf of the company. Pankuch testified he said, "Okay. Have a good evening," then left. (*Id.*, p. 290.)

**{¶30}** According to Betsy, it was Edgell who "raised his voice" when she demanded a new roof. According to Billy Joe, Edgell raised his voice when Betsy pointed out Edgell had never replaced the tomato pots. Betsy testified she lost confidence in Edgell when he destroyed her tomato pots and did not acknowledge the accident. (*Id.*, p. 173.)

**{¶31}** Following the August 31, 2020 meeting, and according to the text chain, Billy Joe informed Edgell that Appellees were still busy with his father's estate, and to "hold off on the [larger] screws" and keep his regular schedule with other customers. Billy Joe explained that he wanted to be present for the repairs. Edgell responded, "Get ahold of me when your [sic] ready for us to resume work." (*Id.*, p. 120.)

**{¶32}** Billy Joe testified Appellees had lost "total confidence" in Edgell "after looking at the total package of what had been done to this building," but he would have allowed Edgell to install a new roof. (*Id.*) When Edgell suggested the more conservative repair, Appellees consulted with Enos Miller ("Enos"), who they later hired to repair the garage.

**{¶33}** According to Edgell, Appellees did not contact him after the text message telling him to hold back on the larger screws. Edgell believed Appellees were busy administering the probate estate. Edgell testified that he contacted Appellees twice to communicate that he would be willing to fix anything they believed to be improperly done. (*Id.*, p. 245.) A September 10, 2020 text reads, "We are ready to move on fixing that roof leak when your [sic] ready for us." Billy Joe responds, "ok I'll let u [sic] know."

**{¶34}** Based on the recommendation of a local realtor, Appellees hired English to conduct an inspection of the garage. English conceded that he was licensed in Ohio exclusively for the inspection of commercial buildings, but he likened the garage to a commercial building because it was not a residence.

**{¶35}** English inspected the garage for roughly two hours on October 5, 2020 and produced a 26-page report containing his conclusions regarding the workmanship. English was qualified as an expert "in the field of residential and commercial inspections"

at the bench trial without objection by Appellants. (*Id.*, p. 14.) Based on an invoice admitted into evidence, Appellees paid Enos $3,560.16 for the materials required for a new roof that same day.

**{¶36}** With respect to the exterior of the building, English observed most of the screws used on the metal siding, which have a neoprene or rubber washer, were over-torqued. Because the screws were compressed, the rubber washers were distorted so they were no longer water-resistant. Further, English opined the exposure of the distorted washers to the sun would shorten their life span. Of equal concern, the over-torqued screws had caused dimpling in the metal siding.

**{¶37}** Edgell, on the other hand, testified "you've got to smash the rubber [washer] to make it airtight." (*Id.*, p. 227.) Edgell observed the screws were properly installed and any problem with the screws was the result of the building shifting when it was hit. He further testified the removal of the screws, which he had proposed would be replaced with larger screws, would have resolved the dimpling.

**{¶38}** There were also several[2] screws that were crooked, which English opined would similarly impact water resistance. English testified the building was also susceptible to damage in high winds due to the improperly-installed screws. However, Edgell testified there were thousands of screws in the pole building and the state of the screws identified in the report could be attributable to the alleged impacts to the building after construction.

**{¶39}** English opined the rake edge (at the gable end), the Z trim (where two different shades of metal meet), and the metal corner trim, which are all installed to ensure watertight construction, were not properly secured. Both the metal corner trim and the garage door trim were improperly installed, rendering the building susceptible to leakage and wind damage. English recommended the rake edge and trim be secured according to manufacturer's specifications. Edgell countered the rake edge and the Z trim were properly installed, but the crooked trim likely resulted from the building shifting when it was hit.

---

[2] When asked to define "several," English responded, "more than one. I cannot give you a total. I just observe what I see, take a representative number of pictures, and make my observation." (Trial Tr., p. 57.)

Case No. 23 CO 0013

**{¶40}** English employed a drone to inspect the roof. Edgell testified that a proper roof inspection could not be completed using a drone.

**{¶41}** English observed the ridge vent framework (the wood frame of the roof) was not properly spaced, and the framing would have to be cut or reset. English explained at trial that proper spacing was essential to air flow, as the "metal would allow air to come in, flow in, and then it would flow through the attic structure above the trusses there, and it would flow out the ridge vent." (*Id.*, p. 59.)

**{¶42}** However, Edgell testified the spacing to which English referred was required for residential ventilation. Edgell explained that a 120-foot vented soffit was installed, which allows the roof to breathe, and it has one-inch bumps in the metal every nine inches, which vents the roof.

**{¶43}** Pankuch similarly testified:

> On a house, you run your plywood up and leave an inch gap on each side. That allows the ventilation to come through the soffit, through the attic, and up through that vent at the peak. * * * On a pole building, you have a vapor barrier going over the whole inside of the building, so the condensation [does not] adhere to the ceiling and drip down. * * * And now the ventilation will go underneath the metal, between the metal into a vapor barrier, and go out through the ridge cap.

(*Id.*, p. 281-282.)

**{¶44}** Next, English testified the majority of the screws on the roof were also over-torqued. English suggested the roof manufacturer likely recommends a preferred screw, but installation of the recommended screw was equally significant with respect to water resistance. In the judgment entry on appeal, the trial court found the company used " 'old style' " screws, however, that phrase does not appear in the trial transcript. Pankuch, who walked on the roof on the final day of construction, testified no screws were over-torqued.

**{¶45}** During cross-examination, English first opined the entire roof should be replaced as the dimpling resulting from the over-torqued screws could not be corrected.

(*Id.*, p. 60.) However, later in his testimony, he opined any recommendation regarding a new roof was "outside the scope of what [he] would have done." (*Id.*, p. 69.) More specifically, English testified "you'll need to talk to a contractor to get [recommendations regarding repair and replacement] or a structural engineer to – to get that final opinion." (*Id.*, p. 68.)

{¶46} With regard to the structure, English observed several of the posts were not plumb. He defined the term "plumb" as "a reference for something to be straight vertically." (*Id.*, p. 71.) English conceded he did not check all of the posts, only a representative number of them. Nonetheless, most of the posts he measured were out of plumb by 2 to 4 inches. English further observed the second garage door frame was not plumb, but opined it is not a major structural concern, as it could be corrected when the garage doors were installed.

{¶47} Later in his testimony, English opined the building was not "terribly out of plumb, but there is some concern that it is out of plumb." (*Id.*, p. 72.) He testified, [t]he more out of plumb a post is, the less structural integrity the post has. The – to the point of a significantly out of plumb post carries no structural integrity, and can fail." He continued, "[a]s to why it became out of plumb, I don't know. So, you know, it was – I would base it on, you know a little more in depth, which would be a structural engineer, as to what caused the – the posts to be out of plumb." (*Id.*)

{¶48} Although English conceded the posts could have shifted due to settlement of the footing, he testified he could not determine whether the footing had settled. English testified the majority of settlement occurs in the first few years, however he offered no opinion on the amount of settlement that typically occurs in the first few months.

{¶49} Pankuch testified that when he visited the property on August 31, 2020, he immediately noticed one particular post by the garage doors "was just totally pushed out." (*Id.*, p. 286.) Then Edgell asked Pankuch to walk around the back of the building to show Pankuch that the back of the building was "all out of whack." Pankuch testified it "definitely was not that way when [he] left the job [on May 18, 2020.]" Pankuch further testified Billy Joe "had said something to the guy that was doing the dirt about hitting the building a few times." (*Id.*, p. 287.)

**{¶50}** English testified the side posts at the gable ends were not the proper length. Although the side posts are not load-bearing, English opined "additional posts [needed] to be sistered to the existing posts and extended the full height of the gable sides." (Rep., p. 6.) He testified damage could result under periods of high winds because the posts do bear some weight during periods of high snow load.

**{¶51}** However, Edgell disagreed with English's conclusion regarding the side posts. Edgell testified:

> [A] truss is made to set on the headers. That's where the weight is made to set. That's the weight bearing, is the header. When they build houses, they don't have nothing [sic] that goes to the top of the truss. Anything that goes to the top of the truss is the builder's convenience. And, as you can see in the one picture, on the end that we started setting trusses, we had 2x4's [sic] that went to the top that held our first truss. And then you build off of that.

(*Id.*, p. 222.)

**{¶52}** Edgell testified there is no code section in Columbiana County or any other codebook that requires posts that reach to the top of the truss. (*Id.*, p. 269.) Edgell further testified "[i]f the groundwork would have been better, [he would] have had longer posts." (*Id.*, p. 250.)

**{¶53}** Finally, Edgell explained the sistering boards (the 2x4 wooden boards attached to the posts) were not installed to lengthen the posts. He testified:

> We started on that end, setting trusses. And we needed something up there to hold that first truss. That hold – that holds the first truss. And then you build off of that. And then you brace back, truss to truss. And you brace the trusses one way or the other way. So it pushes and pulls at the same time. But that is just to hold the first truss plumb.

(*Id.*, p. 271-272.)

**{¶54}** English observed none of the posts were rated for extreme ground contact. English explained at trial that the lumber used was for above-ground construction, not for contact with concrete, earth, or water. English opined the lumber used would have a maximum life of twenty to twenty-five years, or maybe a little less, as opposed to fifty years had the proper lumber been used. However, Edgell testified that "[t]reated lumber is made to go in the ground." (*Id.*, p. 224.)

**{¶55}** According to the report, the right facing wall had a deflection of approximately two inches. However, Edgell testified the side wall was straight during his post-construction inspection.

**{¶56}** English also observed the entrance door was difficult to open. English opined the difficulty was caused by either settlement or improper installation. English recommended the door be reset square in the opening.

**{¶57}** Edgell countered that the door opened and closed with ease during his post-construction inspection. He further testified there is 80 pounds of concrete under each post so he did not believe the problem was the result of settlement, but instead of the building having been "twisted or pushed sideways with a machine." (*Id.*, p. 223.)

**{¶58}** Finally, English explained "[a] pole building is built with posts, and then horizontal studs, and the siding is then attached to the horizontal studs." (*Id.*, p. 66.) He testified "a good number of screws" were missing the studs, affecting structural integrity. Edgell responded that the report only documented three screws missing the studs.

**{¶59}** Each of English's opinions were accompanied by photographs depicting the stated problems. English opined, "[w]hen you find screws are missing the horizontal studding, typically you know there's a problem with the overall structure of the building. The posts being not straight and the dimpling of the roof, all leads towards [sic], you know, less that high-quality construction." (*Id.* at p. 41.)

**{¶60}** Following the testimony of Edgell and Pankuch, Betsy retook the stand. She testified she did not witness Appellees' excavator hit the building. However, on cross-examination she conceded she was not present every day that the excavator was working on the property. Betsy further denied cursing at Edgell, as she testified she only curses in front of her cousin and her brother. Curiously, Billy Joe, who allegedly confessed the excavator hit the building numerous times, did not retake the stand.

{¶61} Billy Joe testified Enos installed a new roof, which included a drip edge, and he replaced 70 to 80 percent of the metal siding. Enos extended the posts, braced the trusses, and "spliced out [the crooked walls] to get them as true as possible." (*Id.*, p. 124.)

{¶62} Enos began the repairs on December 10, 2020 and completed the work on December 18, 2020. As of the date of the bench trial, there was no water leaking into the building. Albert Miller installed the garage doors on February 17, 2021.

{¶63} Two invoices captioned "ENOS MILLER CONSTRUCTION," dated October 5, 2020 and December 21, 2020, which were admitted into evidence at the bench trial establish the following payments made to Enos by Appellees for labor and materials:

| | |
|---|---|
| Black 40 yr metal roof pckg | $3560.16 |
| Roof labor | $2200.00 |
| Repair Materials for outside Building | $773.65 |
| Materials for Interior Building | $2752.54 |
| Labor 3 guys x 260 per guy x 5 Days | $3900.00 |
| | $13,186.35[3] |

{¶64} After the bench trial, the parties filed post-trial briefs. On January 20, 2023, the trial court issued the judgment on appeal in favor of Appellees on both the breach of contract and unjust enrichment claims.

{¶65} The trial court rejected Edgell's explanations for the various problems identified by English, finding that Edgell's testimony "stretch[ed] his credibility to the breaking point." (1/20/23 J.E., p. 4.) The trial court opined that Edgell blamed the lumber supplier for the use of UC2 posts, rather than UC4, posts, and he blamed the excavator for the improper grading. Finally, the trial court found no evidence to support Edgell's testimony that the building had been hit by heavy equipment up to six times. The trial

---

[3] The damages award on the breach of contract claim is 16 cents less than the actual damages suffered by Appellants. The damages award on the unjust enrichment claim is 19 cents less than the actual damages suffered by Appellees. Both errors appear to be unintentional discrepancies, however, Appellants have not challenged the trial court's damages calculation.

Case No. 23 CO 0013

court opined, "[i]f that occurred, the damage would be plainly visible, even more so than the dimpling caused by an overdriven screw. No such damage to the pole building is depicted or evident." (*Id.*, p. 5.) The trial court similarly rejected Edgell's testimony that the backfilling may have been done improperly, as Appellees testified the task was performed in accordance with Edgell's testimony. Finally, the trial court recognized English did not testify that all of the posts were not plumb, which explained Appellants' photographs establishing that some of the posts were plumb on the day construction was completed.

{¶66} Observing that "[a] new building that is not even wind or weather tight is the antithesis of a good job done, with ordinary care," (*Id.*, p. 6), the trial court concluded Appellants had breached the oral contract Appellants entered into with Appellees by failing to meet their duty to construct the pole building in a workmanlike manner. Under the heading "[Appellees'] damages," within the breach of contract analysis and prior to the unjust enrichment analysis, the trial court opined:

> The cost of the repairs performed by [Enos] totaled $13,186.19. I find these repairs by [Enos] are necessary and reasonable in amount and are due directly to the material breach of contract between [Appellees] and [Appellants].
>
> * * *
>
> Based upon the weight of the evidence, I find that [Appellants] were responsible for the cost of installing the overhead doors, which is $1,400.00.

(*Id.*, p. 8.) Therefore, the trial court awarded damages of $13,186.19 for the payments to Enos and $1,400.00 for the installation of the overhead doors, which totaled $14,586.19 on the breach of contract claim.

{¶67} Turning to the unjust enrichment claim, the trial court rejected Appellants' argument that recovery for unjust enrichment is inconsistent with the existence of an express contract. The trial court predicated its conclusion on the fact that "[Billy Joe] requested a written contract, [but Edgell] would not provide one." (*Id.*, p. 8.) The trial court also made a damages award under the theory of unjust enrichment:

Based upon my analysis and what has already been written above, [Appellants] have been enriched by [Appellees] in the sum of $14,586.16. This sum is the amount that [Appellees] were required to expend in order to correct the material deficiencies in the pole building constructed by [Appellants]. Without re-payment or restitution, it would be unjust to allow [Appellants] to retain this benefit at the expense of [Appellees].

(*Id.*)

{¶68} As a consequence, in the concluding paragraph of the judgment entry following the trial court's analysis of both the breach of contract and unjust enrichment claims, the trial court entered judgment in favor of Appellees and awarded damages in the amount of $14,586.16. The damage award is the sum of repairs performed by Enos ($13,186.16, less a 19 cent discrepancy), plus the cost of installing the garage doors ($1,400.00). Although the trial court separately found identical damages under both legal theories advanced by Appellees (but for the 3 cent discrepancy), the trial court entered a single damages award in the concluding paragraph of the judgment entry.

{¶69} This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

**THE EVIDENCE PRESENTED AT TRIAL BY [APPELLEES] WAS INSUFFICIENT TO SUPPORT THE TRIAL COURT DECISION OF JANUARY 20, 2023 AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶70} In an appeal from a civil bench trial, Ohio appellate courts generally review the trial court's judgment under a manifest weight of the evidence standard. *DeSarro v. Larkins*, 7th Dist. Columbiana No. 15 CO 0021, 2017-Ohio-726, ¶ 13. Appellate courts weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered. *Id.* at ¶ 14, citing *Eastley v. Volkman*, 132 Ohio

St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.  In weighing the evidence, a reviewing court must always be mindful of the presumption in favor of the finder of fact. *Eastley* at ¶ 22.

**{¶71}**  "In order to recover on a claim of breach of contract, the plaintiff must prove (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff." *Price v. Dillon*, 7th Dist. Mahoning Nos. 07-MA-75, 07-MA-76, 2008-Ohio-1178, ¶ 44.

**{¶72}**  The implied duty to perform in a workmanlike manner is explained in the Ohio Supreme Court's decision in *Jones v. Centex Homes*, 132 Ohio St.3d 1, 2012-Ohio-1001, 967 N.E.2d 1199:

> A duty is imposed by law upon a builder-vendor of a real-property structure to construct the same in a workmanlike manner and to employ such care and skill in the choice of materials and work as will be commensurate with the gravity of the risk involved in protecting the structure against faults and hazards, including those inherent in its site. If the violation of that duty proximately causes a defect hidden from revelation by an inspection reasonably available to the vendee, the vendor is answerable to the vendee for the resulting damages.

*Id.* at ¶ 6. "In a construction contract, a breach of the implied duty to perform in a workmanlike manner constitutes a breach of the contract."  *Yashphalt Seal Coating, LLC v. Giura*, 7th Dist. Mahoning No. 18 MA 0107, 2019-Ohio-4231, ¶ 18.

**{¶73}**  The trial court credited the testimony offered by Appellees at the bench trial and soundly rejected the testimony offered by Appellants.  "To the extent an issue hinges on credibility, we defer to the trial court's judgment because issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the factfinder." *Hercules LED, LLC v. Drabiski*, 2022-Ohio-4359, 202 N.E.3d 808, ¶ 20 (7th Dist.), *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984). Moreover, Appellees have offered no argument challenging the trial court's credibility assessment, other than the fact that English is not licensed to perform residential inspections.  Accordingly, we find the trial court's decision as it relates to the breach of

contract claim does not constitute a manifest miscarriage of justice and Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING JUDGMENT ON [APPELEES'] CLAIM FOR UNJUST ENRICHMENT.**

**{¶74}** "Generally, the doctrine of unjust enrichment is 'inapplicable if an express agreement existed concerning the services for which compensation is sought; [and] the parameters of the agreement limit the parties' recovery, in the absence of bad faith, fraud or illegality.'" *Bova v. B & J Pools, Inc.*, 7th Dist. Mahoning No. 22 MA 0033, 2023-Ohio-1680, 16, quoting *Pawlus v. Bartrug*, 109 Ohio App.3d 796, 800, 673 N.E.2d 188 (9th Dist.1996), citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55, 544 N.E.2d 920 (1989). "However, when evidence is presented at trial that a party breached the contract and was unjustly enriched by separate conduct, both claims may be viable." *Bova* at ¶ 16, citing *Zeck v. Sokol*, 9th Dist. Medina No. 07CA0030-M, 2008-Ohio-727, ¶ 14-16. Insofar as the trial court here found damages existed under the breach of contract claim, we find the trial court erred in entering judgment in favor of Appellees also on the unjust enrichment claim.

**{¶75}** Appellees contend an unjust enrichment claim only fails when there exists a written contract, citing *Seneca Valley, Inc. v. Caldwell*, 156 Ohio App.3d 628, 2004-Ohio-1730, 808 N.E.2d 422 (7th Dist.), which reads in relevant part:

The law relative to unjust enrichment actions when a written contract exists between the parties provides:

"Absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment, particularly when the express agreement contains a provision governing the allegedly inequitable conduct of the other party." *Sammarco* [*v. Anthem Ins. Cos., Inc.,*] 131 Ohio App.3d 544, 557, 723 N.E.2d 128[, 137 (1st Dist.1998), overruled on other grounds by *Littlejohn v. Parrish*, 1st Dist. No. C-040720, 163 Ohio App.3d 456, 2005-

Ohio-4850, 839 N.E.2d 49]. See, also, *Youngstown Buick Co. v. Hayes* (Oct. 26, 2000), 7th Dist. No. 98 CA 159, 2000 WL 1635710.

*Seneca Valley* at ¶ 116-117.

**{¶76}** However, " 'an express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound.' " *Matlock v. Reck*, 2d Dist. Montgomery No. 27692, 2018-Ohio-1650, quoting *Keybank Natl. Assn. v. Mazer Corp.*, 188 Ohio App.3d 278, 2010-Ohio-1508, 935 N.E.2d 428, ¶ 32 (2d Dist.) (further citation and quotation omitted.). Therefore, express contracts can be written or oral. *Baker & Hostetler, L.L.P. v. Delay*, 10th Dist. Franklin No. 08AP-1007, 2009-Ohio-2507, ¶ 19.

**{¶77}** Ohio intermediate appellate courts have rejected unjust enrichment claims where there exists an oral contract. *See Scott v. First Choice Auto Clinic, Inc.*, 2023-Ohio-3855, 226 N.E.3d 1132, ¶ 22 (10th Dist.); *Watershed Mgt., L.L.C. v. Neff*, 4th Dist. Pickaway No. 10CA42, 2012-Ohio-1020, ¶ 40. Insofar as the parties to this case exchanged promises and communicated the terms to which they agreed to be bound in the oral contract, and there are no damages following from conduct separate from the breach of that oral contract, we find the second assignment of error has merit and reverse the trial court's judgment on the unjust enrichment claim.

## CONCLUSION

**{¶78}** For the foregoing reasons, the decision and judgment entry is affirmed in part, as it relates to the breach of contract claim and the damages award of $14,586.19, and reversed and vacated in part, as it relates to the unjust enrichment claim.

Waite, J., concurs.

Robb, P.J., concurs.

Case No. 23 CO 0013

_____

For the reasons stated in the Opinion rendered herein, the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed in part, as it relates to the breach of contract claim and the damages award.  We reverse and vacate in part, as it relates to the unjust enrichment claim.  Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**